Joel Gregory ARNOLD, Appellant,

v.

The STATE of Texas, Appellee.

Anderson GAINES, Appellant,

v.

The STATE of Texas, Appellee.

Edwin Francis HOOPER, Jr., Appellant,

v.

The STATE of Texas, Appellee.

Gary Wayne PAYNE, Appellant,

v.

The STATE of Texas, Appellee.

Peggy Marie TAYLOR, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 482–89, 483–89, 507–89, 627–89, 530–89 and 373–89.

Court of Criminal Appeals of Texas, En Banc.

Jan. 24, 1990.

Rehearing Denied March 7, 1990.

Robert T. Baskett (court appointed on appeal only), Dallas, for Arnold.

Henry Wade, former Dist. Atty., John Vance, Dist. Atty., and Donald G. Davis, Norman Kinne and Mark Hasse, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

David R. Weiner (court appointed on appeal), San Antonio, for Gaines.

Sam D. Millsap, Jr., former Dist. Atty., Fred G. Rodriguez, Dist. Atty., and Edward F. Shaughnessy, III, Phylis West, Juan Chavira and Raymond J. Hardy, Jr., Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

George O. Jacobs, Houston, Jim Vollers, Austin, for Hooper.

John B. Holmes, Jr., Dist. Atty., and Harvey Hudson, Dan Rizzo and Leslie Brock, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

John H. Hagler (on appeal only), Dallas, for Payne.

Henry Wade, former Dist. Atty., John Vance, Dist. Atty., and Mary Jo Kain, Thomas R. Gregg, Stephen Miller and Pamela Sullivan Berdanier, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Danny D. Burns, Fort Worth, for Taylor.

John Vance, Dist. Atty., Kathi Alyce Drew, Marcus Busch and Mark Hasse, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON PETITIONS FOR DISCRETIONARY REVIEW

CLINTON, Judge.

These causes present various aspects of application of Tex.R.App.Pro.Rule 81(b)(2) to "statutory" error at the punishment stage in charging a jury on parole law pursuant to Article 37.07, § 4, V.A.C. C.P. *Rose v. State,* 752 S.W.2d 529 (Tex.Cr. App.1987–1988). *"Rose error"* is giving an instruction in terms of the constitutionally infirm statute. *Id.,* at 535, 537 and 553–554.

Finding that courts of appeals are conducting disparate harm analyses of *Rose* error, we granted review in these causes and consolidated them for submission on briefs and oral argument in order for this Court to address recurring problems in appellate review of *Rose* error. Tex.R.App. Pro.Rule 200(c)(1), (2) and (6). We begin with pertinent basic underlying propositions, then discuss various germane considerations and finally apply them to specific situations at issue.

### I

Unlike the rule governing reversal of judgment in a civil cause, Rule 81(b)(2) provides:

"If the appellate record in a criminal case reveals error in the proceedings below, the appellate court SHALL reverse the judgment under review, *unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.*" [1]

To the fullest extent of legislatively granted authority, this Court created the rule in interest of consistency and our formulation of the "unless" clause is taken practically verbatim from language in *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), that the Supreme Court isolated and iterated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in fashioning its rule for determining when "a federal constitutional error can be held harmless," *viz:*

"... There is little, if any, difference between our statement in *Fahy v. Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring *the beneficiary of constitutional error to prove beyond a reasonable doubt that the error com-*

1. Independent of Rule 81(b)(2) there are statutes specially providing a standard of review of some errors, e.g., *Almanza v. State,* 686 S.W.2d 157, at 171 (Tex.Cr.App.1985); see *Rose v. State,* supra, at 537, 553. Moreover, because, as well as violations of mandatory statutes, some constitutional violations "by their very nature cast so much doubt on the fairness of the trial process that, *as a matter of law, they can never be*

*considered harmless,* [e.g.,] Sixth Amendment violations that pervade the entire proceeding," *Satterwhite v. Texas,* 486 U.S. 249, at 253, 108 S.Ct. 1792, at 1794, 100 L.Ed.2d 284, at 293 (1988), Rule 81(b)(2) presupposes that the error in question is subject to a harmless error analysis not provided elsewhere. (All emphasis here and throughout is supplied by the writer of this opinion unless otherwise indicated.)

*plained of did not contribute to the verdict obtained.* We, therefore, adhere to the meaning of our *Fahy* case when we hold, as we do now, that before a federal constitutional error can be held harmless, *the court must be able to declare a belief that it was harmless beyond a reasonable doubt.*" *Id.,* at 24–26, 87 S.Ct., at 828–829, 17 L.Ed.2d, at 710–711.

See *Mallory v. State,* 752 S.W.2d 566, at 569 (Tex.Cr.App.1988) (Rule 81(b)(2) eliminated elective propriety of expressing test for harmless error in a less than uniform fashion); *Harris v. State* (Tex.Cr.App. No. 69,366, delivered June 28, 1989, motion for rehearing pending) (Rule 81(b)(2) is "rhetorical and semantic equivalent of the harmless error standard announced by the Supreme Court for constitutional errors in *Chapman v. California,*" *id.,* majority slip opinion at 29); *Bennett v. State,* 766 S.W.2d 227, at 229, n. 7 (Tex.Cr.App.1989) (Rule 81(b)(2) is codified progeny of *Chapman v. California* harmless error analysis).[2]

Applying the federal rule to Texas punishment proceedings are *Burgett v. Texas,* 389 U.S. 109, 115, 88 S.Ct. 258, 262, 19 L.Ed.2d 319 (1967) (admission of presumptively void prior conviction not cured by instruction to disregard, nor harmless within meaning of *Chapman v. California,* supra), and the opinion in *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); see also our own decisions preceding Rule 81(b)(2) in, e.g., *Maynard v. State,* 685 S.W.2d 60, at 67–68 (Tex.Cr.App.1985), *Clemons v. State,* 605 S.W.2d 567, at 571–572 (Tex.Cr.App.1980), and *Jordan v. State,* 576 S.W.2d 825, at 829–830 (Tex.Cr.App.1978).

■ Thus while previously this Court has often dealt with harm in jury misconduct implicating parole law, insofar as making an analysis under Rule 81(b)(2) to determine likelihood of harm resulting from an unconstitutional instruction pursuant to Article 37.07, § 4, appellate courts confront a task with little precedent. We do know the rule is applicable and that as beneficiary of the error the State has the burden to show beyond a reasonable doubt that the error did not contribute to the verdict on punishment. *Chapman v. California,* supra, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d, at 710; *Satterwhite v. Texas,* supra, 486 U.S. at 259, 108 S.Ct., at 1798, 100 L.Ed.2d, at 295; *Harris v. State,* supra, (Clinton, J., dissenting at 10); see *Hargraves v. State,* 738 S.W.2d 743, at 749 (Tex.App.—Dallas 1987) PDR refused. Thus an appellate court must be able to find an error harmless beyond a reasonable doubt. Rule 81(b)(2); *Chapman v. California,* supra.

## II

### A

Where the evil produced by a constitutional violation at trial is limited in scope to erroneous admission of particular evidence, an impermissible comment or a flawed instruction on guilt, usually a reviewing court may undertake with some confidence its task of assessing the likelihood that the error materially affected deliberations of the jury. *Satterwhite,* supra, 486 U.S. at 257, 108 S.Ct., at 1797–1798, 100 L.Ed.2d, at 294–295; *Holloway v. Arkansas,* 435 U.S. 475, at 490–491, 98 S.Ct. 1173, at 1182, 55 L.Ed.2d 426, at 438 (1978); see *Carella v. California,* 491 U.S. ——, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989).[3] However,

**2.** For a more extensive history of development and application of the federal rule to judgments of *conviction,* see *Harris v. State,* supra, majority slip opinion at 32–33, and dissenting slip opinion of Clinton, J., at 2–8. The latter focuses particularly on erroneous admission of "tainted" evidence and erroneous allowance of impermissible comment on *failure of accused to testify,* and only tangentially mentions charging error, at 5, but the cases collected in note 6 do not treat instructions on *punishment.*

**3.** In *Chapman v. California,* for example, the Supreme Court believed argument on failure to testify coupled with an instruction to the effect that the jury "could draw adverse inferences from [accused's] failure to testify," *id.,* at 19, 87 S.Ct., at 824, 17 L.Ed.2d, at 707–708 (see n. 2 for complete text), "impressed the jury that from the failure of petitioners to testify, to all intents and purposes, the inferences from the facts in evidence had to be drawn in favor of the State[.]" *Id.,* at 25, 87 S.Ct., at 829, 17 L.Ed.2d, at 711. *Quaere* the result had the instruction

the scope of *Rose* error may not be so readily discerned, or its consequences so easily assessed. *Rose*, supra, at 537 and 554; cf. *Satterwhite*, supra, 486 U.S. at 256, 108 S.Ct., at 1797, 100 L.Ed.2d, at 1798.

In all felony cases where a jury determines punishment, there is not an "issue" as such for it to decide; indeed common practice is to admonish the jury that "it will not be proper for you in determining the penalty to be assessed to fix the same by ... any method other than a full, fair, and free exercise of the *opinion* of individual jurors under the *evidence* admitted before you." Texas Criminal Pattern Jury Charges (State Bar of Texas 1975), § CPJC 12.42((a)-(c), at 84, and § CPJC 12.42(d), at 87; McCormick & Blackwell, Texas Criminal Forms and Trial Manual, § 81.05, 8 Texas Practice 270; McClung, Jury Charges for Texas Criminal Practice (Rev. Ed.1988) 242. Intruding into its wide area of discretion, the Legislature commanded that the jury be instructed about the parole law—"the court *shall* charge the jury in writing as follows"—as applicable to the status of defendant depending upon its verdict of guilt, an affirmative finding of a deadly weapon and allegations of prior conviction for enhancement. Article 37.07, § 4(a), (b) and (c).

"The evil to be avoided is the consideration by the jury of parole in assessing punishment." *Rose v. State*, 752 S.W.2d 529, at 535, quoting *Clark v. State*, 643 S.W.2d 723, 725 (Tex.Cr.App.1982). Thus the task of a reviewing court is to make "an intelligent judgment" about whether the unconstitutional instruction "might have affected [or influenced]" deliberations of the jury on punishment. *Satterwhite*, supra, 486 U.S. at 258, 108 S.Ct., at 1798, 1799, 100 L.Ed.2d, at 295, 296; see *Maynard v. State*, supra, at 67–68; *Clemons v. State*, supra, at 571–572; *Jordan v. State*, supra, at 830; *Spelling v. State*, 768 S.W.2d 949 (Tex.App.—Fort Worth 1989) PDR pending (Keltner, J., dissenting)

("whether the trial court's instruction on parole subjectively influenced the jury's verdict"). Again, under Rule 81(b)(2) the burden of negativing any such influence beyond a reasonable doubt is on the State. See *ante*, at 298.

As we analyzed § 4 in *Rose*, in each subsection the statute mandates the trial court to inform the jury:

first: "Under the law applicable to this case, *the defendant* ... may earn *time off the sentence imposed* through the award of good conduct time;"

second: that length of imprisonment "*might* be reduced by the award of parole;"

third: "Under the law applicable to this case," there is a precise formula (with or without good conduct time) to determine when "*the defendant*" will become *eligible for parole* ;

fourth: While one cannot accurately *predict* "how the parole law and good conduct time *might* be applied to this defendant," because that "*will* depend on decisions made by prison and parole authorities;" still,

fifth: jurors are instructed: "*You may CONSIDER the existence of the parole law and good conduct time.*"

*Rose*, at 535.

That is to say, when it comes to assess punishment the jury may deliberate on the content of what the trial court has just explained in the preceding four paragraphs in making its decision as to the number of years it will assess as punishment. *Ibid; Rogriguez v. State*, 762 S.W.2d 727, at 733 (San Antonio 1988) no PDR (instruction encourages jury to consider existence of parole law and good conduct time); *Olivarez v. State*, 756 S.W.2d 113, at 115–116 (Tex. App.—San Antonio 1988) no PDR (jury allowed to deliberate on content of first four paragraphs of statutory parole law charge).

stood alone. See *Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), and *post* at 313, n. 27. Unlike the concurring opinion herein, the Supreme Court has never sug-

gested a *Jackson v. Virginia* standard for review of sufficiency of evidence should apply to a harmless error analysis regarding assessment of punishment.

That the jury is thereafter told not to consider "the *extent* to which good conduct time *may be* awarded or forfeited" or "the *manner* in which the parole law *may be* applied" to the defendant, we held to be of "no constitutional consequence," because jurors "had already been instructed that *they* may CONSIDER the stated explanation of parole law and good conduct time." *Ibid.* Obviously, the only purpose in allowing *jurors* to consider "existence" of parole law and good conduct time is to inform their assessment of punishment; the instruction is "clearly designed to increase [the] sentence," *Gabriel v. State,* 756 S.W.2d 68, at 70 (Tex.App.—Houston [1st] 1988) no PDR. In considering such "existence," however, jurors must not attempt to "predict" how *prison and parole authorities,* respectively, might treat good conduct time and apply the parole law. In short, the jury can take the declarations into account in considering punishment, but without regard to what authorities may later do with the defendant.

The vice in a § 4 instruction is creating an environment for trial participants to induce harm. Because it purports to convey statements of law (inapplicable to any fact in the case, Article 36.14. V.A.C.C.P.), evidence relevant to its declarations is barred by decisional rules and not permitted by § 4(d), and consequently counsel seldom have a real factual basis for arguing those matters to the jury, *Rose,* supra, at 537, the impact of a § 4 instruction is virtually immune from normal appellate review: that jurors actually did consider parole law and good conduct time is rarely evident in the record. See *Rose,* at 537, 554; *Gabriel v. State,* supra, at 69–70; see *Brooks v. State,* 768 S.W.2d 481 (Tex.App.—Houston [1st] 1989 (O'Connor, J., dissenting), and *Satterwhite v. Texas,* supra (Marshall, J., dissenting, 486 U.S. at 262, 108 S.Ct., at 1800, 100 L.Ed.2d, at 297–298 (because few "intangibles" jury might consider can be gleaned from record, appellate court "ill-equipped to evaluate effect of constitutional error on sentencing determination"). Yet it is within that framework that a harmless error analysis must be made.

Otherwise any inquiry would be purely speculative such that a harm analysis would be inappropriate. *Satterwhite v. Texas,* supra, at 256, 108 S.Ct., at 1797, 100 L.Ed.2d, at 294; *Sorrell v. State,* 74 Tex.Cr.R. 505, 169 S.W. 299, at 303 (1914).

But as experience demonstrates, best likelihood is that a jury *will* consider the "existence," and thereby assess a term of years it believes may ensure the defendant serves more than the minimum term prescribed regardless of what prison and parole authorities may later decide. See *Rose,* at 536; *Blackwell v. State,* 768 S.W.2d 9, at 12 (Tex.App.—Fort Worth 1989) no PDR; *Martin v. State,* 768 S.W.2d 12, at 13 (Tex.App.—Fort Worth 1989) no PDR; *Escobar v. State,* 770 S.W.2d 24 (Tex.App.—Dallas 1989) PDR pending; *Rodriguez v. State,* 762 S.W.2d 727, at 732–733) PDR granted on other grounds; *Zwack v. State,* 757 S.W.2d 66 at 71–72 (Tex.App.—Houston [14th] 1988) no PDR; *Gil v. State,* 756 S.W.2d 108, at 109 (Tex. App.—Austin 1988) no PDR; *Austin v. State,* 748 S.W.2d 546 (Tex.App.—Beaumont 1988) PDR refused. A harm analysis should be based on that premise. See, e.g., *Olivarez v. State,* 756 S.W.2d 113, at 114–115 (Tex.App.—San Antonio 1988) no PDR.

With that premise, a reviewing court must examine the record for indicia of factors reasonably conducing to affect minds of average rational jurors in their determination of punishment, the ultimate inquiry being whether it is impossible to say beyond a reasonable doubt that considering declarations made by the trial court in its § 4 instruction law did not influence the jury adversely to appellant in assessing punishment.

**B**

The leading opinion on rehearing in *Rose* conducted its analysis on inability "to know what process the jury underwent" and looked to "factors which indicate that the error was harmless." *Id.,* at 554–555. But we do know from other cases there are other revelations for examination pertinent

to the inquiry.[4] We will discuss them in order of trial.

### 1

First is voir dire examination; when reported in the statement of facts a few courts of appeals routinely review it, only to find either that parole was not mentioned or that certain references to it are not all that significant.[5] But in our view, endeavoring to "qualify" prospective jurors on a § 4 instruction introduces them to a constitutionally forbidden exercise, tends to lay a predicate for further discussion of such matters during the proceedings and carries a high risk of inducing jurors to engage in it during deliberations on punishment. For example, see *Johnson v. State*, 768 S.W.2d 788 (Tex.App.—Dallas) PDR refused.[6]

### 2

■ Since *Rose* an objection is not required to preserve error, *id.*, at 552–553; that § 4 mandates a prescribed instruction is calculated to render it unobjectionable, and thus might have dissuaded defense counsel from making an objection. (To request it is another matter.) But nevertheless that an instruction was submitted over

4. While it does not appear to be a common practice, anticipating a § 4 instruction, counsel may file and present a motion in limine directed to allusions to parole law during voir dire and guilt stage, presentation of evidence, charge and argument at punishment and any supplemental instruction in response to requests from the jury. That court and opposing counsel have been alerted at the outset to potential problems might well turn out to be relevant in a harm analysis.

On the other hand, when the trial judge is inclined to withhold an instruction but defendant requests it, as in *Fountain v. State* (Tex. App.—Dallas No. 05–86–00941–CR, delivered April 7, 1989) PDR pending, different considerations are raised.

5. We see this mainly in unpublished opinions, and resort to them now for illumination rather than precedent or authority. Tex.App.Pro.Rule 90(i).

In *Gilbert v. State* (Tex.App.—Dallas No. 05–85–01380–CR, delivered May 9, 1989), PDR pending, the prosecutor "distinguished parole from probation," *viz:*

"... Parole is not an issue in this trial. Parole is when a jury sends someone to the penitentiary, let's say, for thirty years, and after they've served a certain amount of time they are allowed to come back out on the street. After having gone to prison they're allowed an early release here on the street. Okay? ... Parole is not an issue; it's up to the Board of Pardons and Paroles—probation is an issue for a jury ..."

The Dallas Court saw no "harm" in making clear that "parole was not an issue for the jury" but a matter for the Board of Pardons and Paroles. *Id.*, slip opinion, at 4. But it is not so much a question of harm *per se*, as a circumstance relevant to the ultimate inquiry for impact of a § 4 instruction.

In *Williams v. State*, 1989 WL 28394 (Tex.App. —Houston [1st] No. 01–86–00379–CR, delivered March 30, 1989), the court merely recounted that a prospective juror asked a prosecutor about the effect of parole law on assessment of punishment but was promptly told that parole could not be considered in reaching a verdict; she was struck by defense counsel. *Id.*, at 2. Also see *Crawford v. State*, 755 S.W.2d 554 (Tex. App.—Houston [1st] 1988) PDR refused.

These meager instances suggest that counsel rarely broach the subject of parole during voir dire. But we must observe that unless the matter is addressed with caution venirepersons might be exposed to inappropriate representations and misleading interpretations that may influence deliberations of those who become jurors. See discussion on jury argument, *post*.

6. On an evening shooting spree defendant committed aggravated assault, attempted murder and murder against three total strangers. At voir dire defense counsel "extensively" questioned several prospective jurors regarding parole laws and good time credit (content not revealed in opinion); because of their responses counsel challenged some venirepersons, but challenges were denied; the record does not show whether any actually served on the jury. On punishment two older defense witnesses testified they would "help" defendant "if he were paroled while they were still alive." State's PDR at 14. The charge on punishment included appropriate § 4 instructions, as well as finding a deadly weapon. After prosecution waived opening argument, predictably defense counsel spent "considerable amount of time" discussing the § 4 instructions, asking the jury for minimum punishment; just as predictably the State argued the facts and maximum punishments, explaining sentences would run concurrently and "only a life sentence would give the jury any assurance that [defendant] would be detained in prison for any length of time." Jury found use of a deadly weapon and assessed maximum punishment for each offense, towit: ten years, twenty years and life respectively. Unable to determine beyond a reasonable doubt that the § 4 errors made no contribution to punishment, the Dallas Court reversed and remanded for a new trial under Article 44.29, V.A.C.C.P.

objection serves to dispel any speculative notion that counsel might be seeking to gain some advantage from the instruction. See *Gabriel v. State*, supra, at 70. That an objection is overruled practically invites legitimate comment, which brings us to argument of counsel.

### 3

Although the leading opinion in *Rose* said that counsel are prohibited from arguing the matter, *id.*, at 537, the cases demonstrate that it is not uncommon for counsel, usually a prosecutor, to address the subject.[7] Moreover, we now agree that "it was not *error* for the State or the defendant to argue the law of parole to the jury," *Blackwell v. State*, supra, at 11. Therefore, it matters not which counsel first "opens" the subject of parole, and consequently an "opener" does not necessarily "invite" opposing counsel to respond in kind or otherwise, such that a reviewing court can say "a defendant may not create reversible error by his own manipulations," *Escobar v. State*, at 27; it is not error and, if not improper, it is not a manipulative invitation. However, there is an important caveat: while an argument may not be *error* per se, one made in terms tending to induce consideration of the eligibility formula and other teachings of a § 4 instruction compounds *Rose* error and may influence the jury in its deliberations on punishment. *Rodriguez v. State*, 759 S.W.2d 141 (Tex.Cr.App.1988), remanding for reconsideration *Rodriguez v. State*, 721 S.W.2d 504, at 507–508 (Tex.App.—Houston [14th] 1986); *Jones v. State*, 725 S.W.2d 770, at 772 (Tex.App.—Dallas 1987); see *Satterwhite v. Texas*, supra, 486 U.S. at 260, 108 S.Ct., at 1799, 100 L.Ed.2d, at 296 ("district attorney highlighted Dr. Grigson's credentials and conclusions in his closing argument").

A classic example of an offending argument by a prosecutor is found in *Moore v. State* (Tex.App.—Dallas No. 05–86–00664–CR, delivered April 10, 1989) PDR refused, (edited somewhat here for brevity, and by deleting emphases and other notations) *viz:*

"The first thing I want to get through right away is this parole charge.... Now, we can't say what might happen ... to the defendant, because we can't read the crystal ball.

---

**7.** Indeed, in *Rose* the fact is that both prosecutors did allude to parole, as Judge Miller noticed in his concurring opinion on original submission, *viz:*

"During final argument, while both prosecutors mentioned that appellant was back in Dallas twelve years after receiving a twenty-five year sentence (as reflected by the admitted evidence of prior convictions), neither gave further attention to that fact nor mentioned parole in their arguments. Both asked for a life sentence because of the facts of the case and appellant's five prior felony convictions."

*Id.*, at 539. But an answer to that notion is that without mentioning the word "parole," given jurors have already heard the instruction read and will have it before them, an artful prosecutor may make the point through examples of how the parole law has worked in the past for the very defendant on trial, and thereby call attention of the jury to it in assessing punishment. See *Clark v. State*, 643 S.W.2d 723 (Tex.Cr.App.1982). The cases are replete with just such stratagems, e.g., *Williams v. State* (Tex.App.—Houston [1st] No. 01–86–00379, delivered March 30, 1989) PDR granted, *viz:*

"[From his record of seven prior convictions and sentences aggregating seventyeight years,] the prosecutor asked for a sentence of at least 78 years and emphasized appellant's character as a 'career criminal.' He further stated: 'Carl Leonard Williams has already, in his lifetime, in the last 18 years, our system has sentenced him to a total of 78 years in prison, and here he sits.'

Although the prosecutor did not directly mention parole law, this comment directed the jury's attention to the fact that appellant would probably not serve the entire sentence, and invited them to consider parole law in assessing punishment."

And in *Escobar v. State*, 770 S.W.2d 24 (Tex. App.—Dallas 1989) PDR pending, *viz:*

"... A jury, in 1973, gave [appellant] a 60 year sentence for the very same thing, for robbery. It is all reflected in there in the court records. Now, 13 years later, here he is back again up to his old tricks. For heaven's sake, folks, give this man a life sentence and never look back.

\* \* \* \* [closing argument] I am asking you for a life sentence.... You know that the 60 years was a joke. He got 60 years and 12 [sic] years later he is back out on the street."

*Id.*, at 25, 26. Even if regarded as "a reasonable deduction from the evidence," *id.*, at 27, it also brings home the point that a lengthy sentence is desirable to keep defendant "off the street." See *Rodriguez v. State*, infra, at 302.

But it says that the defendant ... or person in a case like this, of first-degree murder, with a deadly weapon, could be released on parole when his time served equals a third or twenty, whichever comes first.... Let's take an example of a sixty-year sentence. Its a third or twenty, whichever comes first. Well, a third of sixty is twenty. Twenty years in the penitentiary before he becomes eligible for parole.

I bet you thought, before you heard that, that a sixty-year sentence meant sixty calendar years in the Texas Department of Corrections. As the Judge has given you in his instructions, he's entitled to be—a person charged in this type of case is entitled to be paroled when they have served twenty years. So, really, those sentences are a joke.

[Judge injects, "He's eligible to be paroled [not entitled];" counsel corrects himself: "I'm sorry, eligible.... No one is entitled to parole, but eventually everyone serves out their sentence, one way or the other."]

So, bear that in mind. Whatever sentence you give, for instance, if its a thirty-year sentence, then that means ten before they become eligible for parole. So that's why I'm asking for a maximum sentence in this case, because it will take a sixty-year sentence or better to keep this man in the penitentiary for at least twenty calendar years.

Consider ninety-five or ninety, if you think he's entitled to more consideration than that, maybe you'll consider eighty-five years. But always bear in mind what that one third sentence rule means, because that is where the real impact of your verdict will be felt. Thank you."

*Id.*, slip opinion at 4–5. The jury assessed life; on the strength of that argument the Dallas Court reversed as to punishment. Accord: *Woods v. State,* 766 S.W.2d 328, at 329–340 (Tex.App.—Houston [14th] 1989) no PDR; *Howell v. State,* 757 S.W.2d 513, at 518 (Tex.App.—Houston [1st] 1988) PDR refused; *Morris v. State,* 755 S.W.2d 505, at 511 (Tex.App.—Houston [1st] 1988) PDR refused.

At the other end of the spectrum is, e.g., *Barger v. State* (Tex.App.—Dallas No. 05–85–01242, delivered April 28, 1989) PDR pending (offense is murder; parole not specifically mentioned in argument; prosecutor told jury to look at page four of charge (containing § 4 instruction), that it was "important"); *Pope v. State* (Tex.App.—Dallas No. 05–86–00065–CR, delivered March 27, 1989 (defense counsel mentioned life means serving at least twenty years in argument to lessen punishment).

Somewhere in between are such cases such as *Bonner v. State,* 779 S.W.2d 81 (Tex.App.—Houston [1st] 1989) PDR pending. The offense is murder; defense counsel "emphasized to the jury that they were not permitted to discuss parole law in reaching their decision on punishment;" in his closing argument the prosecutor seemed ambivalent and commented somewhat ambiguously, *viz:*

"... I'm not going to say a word on the parole laws. If I knew what they were, which I don't—the charge controls it. He's told you about that. But I want you to consider what the charge has to say. And that's it.

But I want you to realize that parole is there. That's it. That's all there is to it. I don't have any control over it. And he doesn't have any control over it. The legislature doesn't have any control over it. Really, you can send a message to them. You can send a message to the community; that is that the penalty for crime such as this is grievous, grievous, as it should be."

The jury assessed a term of fifteen years.[8]

Compare, however, *Williams v. State* (Tex.App.—Dallas No. 05–86–00439–CR, delivered February 1, 1989) PDR pending (former "curative instruction" not given; prosecutor mentioned parole and good conduct time under § 4(b), told jury to "think

---

**8.** Considering all extant factors and noting term was "exactly triple the minimum sentence of five years," the Houston [1st] Court was unable to say "the one-third flat time instruction did not contribute to the selection of this number, and our experience suggests that it is at least equally probable that it did." *Id.,* at 82–83.

about" how long defendant would serve, but argument "confusing," so in light of "mid-range sentence" no harm). The conviction is for indecency with a child enhanced by a prior conviction; although not noted by the Dallas Court, at punishment the prosecution waived opening argument and, ending his, defense counsel alluded to parole before suggesting a term "somewhere between five and ten years;" [9] in closing the prosecutor traced the prior criminal record of defendant, reprised the facts of the case and concluded by picking up on defense counsel's submission to ask for life.[10] (Jurors sent out a note, and for more on that incident, see *post*). Then it fixed punishment at fifty years and no fine. *Id.,* slip opinion at 4–5.

A § 4 instruction is *sui generis,* and we do not see a common statewide pattern for jury argument about it. Counsel who choose to address its declarations and their ramifications can create implications of harm, either by their remarks alone or coupled with other indicia in the record. See, e.g., *Miller v. State,* 772 S.W.2d 491 (Tex. App.—Dallas 1989) PDR refused; *Shaw v.*

*State,* (Tex.App.—Fort Worth Nos. 2–86–036–CR & 2–86–073–CR, delivered April 27, 1989) PDR pending; *Johnson v. State,* 768 S.W.2d 788 (Tex.App.—Dallas 1989) PDR refused; *Woods v. State,* 766 S.W.2d 328 (Tex.App.—Houston [14th] 1989), no PDR.[11]

### 4

Regardless of admonitions, argument or other incidents may induce jurors to consider and apply parole law and good conduct time in assessing punishment, and again the cases are replete with proof of violations. See *Rose,* at 356. Which brings us to another factor indicative of harm not extant in *Rose,* namely, the "jury note."

Our appellate courts appear to be reacting variously to a "jury note" and evaluating it in different lights. Compare, e.g., *Martin v. State,* supra, (note "clear indication" jury considered parole instruction) with, e.g., *Escobar v. State,* supra, (presumption that jury followed instructions not rebutted).[12] In *Reyes v. State* (Tex.

---

**9.** Professing not to be smart enough to understand what the Legislature means in that "they say we want to tell the jury about this parole law but we don't want them to consider it," counsel thought "at least we need to touch parole," *viz:*

"... He will become eligible after he gets in good time equal to one-third of his sentence. * * * *

[But] the fact that a man is eligible to be considered for parole doesn't mean that he will make parole and as the Judge's charge tells you, you cannot consider or try to speculate or guess how long this individual would serve on a given sentence.

I would submit you should give him the sentence you think he ... deserve[s] and that's what he will go down on.... [I]f you do want to add some more time for these prior convictions—a year for each conviction would put it up to eight years[.] * * *"

**10.** To that end the prosecutor admonished the jury:

"... [Defense counsel] has some kind of formula.... Throw that at him and see if he will handle that so he can get good time when he gets to the penitentiary. If you give him what he deserves and if you do the right thing, maybe not the easy thing, ... and give him life in the penitentiary and a fine, then you know *when he is eligible.* He gets to sit down there and if he

has good behavior, which *I doubt he can adhere to,* then *he gets all that good conduct time.*

Again, he gets a chance and *all he has to do is serve twenty years,* but he gets all that time and he is *eligible again to see one of your children.* * * * * It is not an easy thing to send someone to the penitentiary for life and to put a $10,000 fine on them.... [Y]ou think about [this child] now and people like her ... and think about good conduct time and think about parole and you think about: Has this defendant learned his lesson in the past and are you going to *let him out one more time.*

Thank you all and God bless you."

**11.** One grievous misstatement sufficed in *Rolling v. State,* 768 S.W.2d 834 (Tex.App.—Dallas 1989) PDR pending:

"... You know [that] the judge has instructed you ... this defendant ... will have to serve at least one third of any numerical number of years that you give him, or twenty years, *whichever is most,* before he is eligible for parole. *Consider that when you assess punishment in this case."*

*Id.,* at 835–836 (emphasis in original).

**12.** In *Escobar* the charge included a *Rose* "curative instruction"—placed ahead of the statutory instruction dictated by § 4; there were arguments by prosecutors alluding to prior sentences and releases of defendant, and by counsel for appellant addressing the § 4 instruction;

App.—Dallas No. 05–86–00037–CR, delivered April 26, 1989), the prosecutor barely alluded to the § 4 instruction, *viz:*

> "I'm going to ask you to return a life sentence. *You have got the parole law in that charge to look at.* He deserves all that you can give him. Unfortunately, under the law, the most you can do is a life sentence. And you know that you can do whatever you want to do with it, but that's what I'm going to ask you to do in this case."

*Id.,* slip opinion, at 6. Nonetheless the jury sent a note, *viz:* "We need clarification of the paròle options as applied to life, 99 years, 60 years sentence." See also, e.g., *Rodriguez v. State,* 762 S.W.2d 727, at 732 (Tex.App.—San Antonio 1988) ("Please clarify the para. that begins 'you may consider the existence of the parole law and good conduct time.'") punishment set aside, PDR granted on other grounds; *Hawkins v. State,* 766 S.W.2d 840, at 842 (Tex.App.—Beaumont 1989) ("Any possibility of parole with a life sentence?") punishment vacated, PDR refused. Similarly, juries want definition of "punishment for life," *Garcia v. State,* 1988 WL 131815 (Tex.App.—Houston [1st] No. 01–87–00708–CR, delivered December 8, 1988) (slip opinion at 6) PDR pending; explanation of "the differences between a 'life' sentence and '99 years,'" *Williams v. State,* supra; whether "terms 99 years and life [are] considered to be one and the same," *Weatherall v. State* (Tex.App.—Dallas No. 05–86–00003–CR, delivered

March 20, 1989) (slip opinion at 5) PDR pending.

Patently when a jury sends out a note making an inquiry of some sort related to parole, it reveals that jurors are then and there "discussing" and "considering" the subject. *Hawkins v. State,* supra, at 842, 843, 844; *Rodriguez v. State,* supra, at 732–733 (apparent jury "did just that and sought further clarification"). Such an important factor in the harm analysis cannot be easily dismissed. Whether a jury has progressed to the point of no return, so to speak, in the sense of "risk that punishment will be based on extraneous considerations," *Rose,* at 537, depends on circumstances of a given case. But when it appears the jury passed the point, reasons for finding no risk and to justify the punishment must be more than a subjective view of the facts of the offense and a prior criminal record. *Satterwhite,* supra.

5

Also to be factored in, but not necessarily related to argument or a "jury note," is the term of years finally assessed. Both features are found in *Williams v. State,* supra.

The offense in *Williams* is indecency with a child (touching her genitals); a prior conviction for burglary of a building was alleged for enhancement; the court instructed that upon finding the prior conviction the jury "will assess the defendant's punishment *somewhere in that range pro-*

---

the jury sent out *three* notes and the judge responded to each. Thus the court had instructed the jurors "not to *discuss* among yourselves" how long the sentence imposed will be served, but that they may "consider" parole law and good conduct time *et cetera,* and counsel for both sides had commented on those matters.

Verbatim, the first note asked, "If a man is given a life term, is he eligible for parole?" The judge responded that "our laws do not permit the Court to answer your question."

The second note wanted to know: "When was his date of release?" The judge answered that "if the information ... is not contained in the exhibits admitted during the punishment portion ..., such information is not available to you."

The third question became more insistent and revealing, *viz:*

"We need clarification of the parole law (see P 7 of the charge). It is our understanding that life imprisonment is eligible for parole in 20 years. Is this correct."

(The seventh paragraph of the charge, taken from third paragraph of a § 4(a) instruction, informs the jury, *inter alia,* that "if *the defendant* is sentenced to a term of imprisonment, *he* will not become eligible for parole until the actual time served equals one-third of the sentence imposed or twenty years, whichever is less, without consideration of any good-conduct time *he* may earn.") The judge instructed the jury to "read carefully" last paragraph of both page 1 and 2 of the charge. They are, of course, the traditional "do not discuss" instruction and the statutory "you may consider" but "you are not to consider" instructions.

*vided by law;* that is, confinement . . . for life or for any term of not more than 99 years or less than five years[;]" see *ante,* at 304, nn. 9 & 10, for summary of argument under § 4(b), and at 305 for jury note.

The jury found enhancement and assessed a term of fifty years, which the Dallas Court characterized as a "mid-range sentence;" it gave that fact considerable weight in finding a § 4 instruction did *not* contribute to punishment. *Id.,* at 298-99.[13] But see *Barreda v. State,* 760 S.W.2d 1 (Tex.App.—Corpus Christi 1987) (nine years for sexual assault "roughly in middle of range" *does* indicate possibility of contribution) PDR dismissed.

As we later discuss, given a current context of a § 4 instruction and sophisticated jurors, any notion that a term of years somewhat less than maximum permitted amounts to a "break" for defendant is passe'. See *post,* note 24, at 312. When early release from confinement on parole is implicated and jurors may comprehend that possibility, it is not enough to say that a § 4 instruction made no contribution to punishment merely because the term assessed is "mid-range" relative to the potential maximum. To the contrary, once a jury comes to understand that any term of years beyond the formula number has no effect on eligibility for parole, cases cited in note 24 *post* demonstrate that jurors are willing to settle on a term higher than the minimum but within limits of the formula. See also, e.g., *Jones v. State,* 725 S.W.2d 770 (Tex.App.—Dallas 1987) PDR refused (prosecutor literally asked the jury to assess a sixty year sentence to assure that defendant would serve at least twenty years compensating for the possibility of parole, and the jury did exactly that).

The Houston [1st] Court makes the point that even without an explanation from counsel jurors are capable of making that calculation themselves, and fixing a term of years to compensate for parole eligibility—what it calls the "one-third rule" in *Wheatly v. State,* 764 S.W.2d 271, at 273 (Tex.App.—Houston 1988) no PDR.[14] When the punishment is higher than an outer limit on parole eligibility, however, speaking through Justice Cohen, the Houston [1st] has attributed the excess to an aggravating circumstance rather than to the § 4 instruction, particularly where counsel never mentioned the latter. See, e.g., *Villanueva v. State,* supra (indicates abhorrence for perpetrators of the crime); *Black v. State,* 1989 WL 28388 (No. 01–85–00869, delivered March 30, 1989) (presumably defendant seen as "career criminal")

13. It and other courts take the view that assessment of "mid-range" punishment suggests harmless error. See, e.g., *Edwards v. State* (Tex.App.—Dallas No. 05–86–0830–CR, delivered March 27, 1989) (sixty years for murder, slip opinion at 6) PDR pending; *Richardson v. State* No. 05–86–00279–CR, delivered March 28, 1989) (sixty years for aggravated robbery, slip opinion at 5) PDR pending; *Romero v. State* (Tex.App.—Austin No. 3–87–126–CR, delivered September 21, 1988 (sixty years for murder, slip opinion at 3). Indeed, one flatly states that sixty years for aggravated sexual assault *"itself* indicates the parole instruction did not contribute to the punishment," *Carter v. State,* 770 S.W.2d 604, at 606 (Tex.App.—Fort Worth 1989) PDR pending. But contrast *Diaz v. State,* 742 S.W.2d 851 (Tex. App.—Austin 1987) (sixty years also "minimum term . . . that must be assessed to achieve the maximum delay in parole eligibility") no PDR, and see discussion *post.*

14. See, e.g., *Early v. State,* 779 S.W.2d 79 (Tex. App.—Houston [1st] 1989) PDR pending, *viz:*

". . . It is noteworthy that the sentence is evenly divisible by three and is exactly triple the minimum sentence of two years. Nothing suggests that the one-third flat time instruction did not contribute to the selection of this number, and *our experience suggests a reasonable probability that it did."*
*Id.,* at 81; *Bonner v. State,* 779 S.W.2d 81, at 83 (Tex.App.—Houston [1st] 1989) PDR pending; see also *Villanueva v. State,* 769 S.W.2d 678 (Tex.App.—Houston [1st] 1989) PDR pending, *viz:*
". . . "The charge instructed the jury that appellant would not "become eligible for parole until the actual time served equals one-third of the sentence imposed or twenty years, *whichever is less,* without any consideration of good conduct time . . .' *The jury knew,* therefore, that appellant would be eligible for parole in 20 years, whether they assessed a sentence of 60 years ($\frac{1}{3}$ of $60 = 20$) or 99 years."
*Id.,* at 680 (first emphasis in original). But see *Spelling v. State,* supra (eschewing "any mathematical formula").

PDR pending.[15]

Thus a verdict on punishment alone is not a gauge for harm; rather, it serves somewhat as a barometric measure of other pressures we have found are likely to influence the jury in assessing punishment. There is no "bright line" rule.

6

There may be, of course, still other considerations, found so rarely, however, that we have not categorized them.

One is a jury finding of a deadly weapon. Aside from determining which instruction under § 4 is appropriate, it may seem to have some bearing on deliberations of jurors in determining punishment. But any bearing should be reasonably rather than erroneously inferred. For example, in *Nunez v. State*, 769 S.W.2d 599 (Tex.App.—El Paso 1989) PDR pending, the offense is aggravated assault, the jury found use of a deadly weapon and assessed punishment at two and one half years. In finding harmless error, the El Paso Court was "further persuaded by the fact that the judgment in this case ... carries a finding of use of a deadly weapon, *requiring service of at least one third of the sentence assessed*," so that "potential harm" was only the "two month difference between a mandatory

eight months service ... and a mandatory ten months service." *Id.*, at 601.[16]

Another is whether there is significance in the fact that the jury rejected an application for probation properly proved up and submitted to it by the court's charge on punishment. In *Garcia v. State* (Tex.App.—Amarillo No. 07–85–0288–CR, delivered January 30, 1989) PDR pending, although appellant argued that he was eligible for probation and the facts surrounding the offense of murder were "hotly contested" and "not particularly heinous," because jury assessed punishment at thirty years there was a reasonble doubt as to effect of the parole instruction; in its opinion, the Amarillo Court did not even address that contention, and concluded that the erroneous instruction did not contribute to the punishment. Slip opinion, at 3–4. Similarly, see *Sanders v. State* (Tex.App.—Texarkana Nos. 6–86–005–CR & 6–86–006–CR, delivered January 18, 1989) PDR pending on motion for rehearing after PDR refused; *Patton v. State* (Tex.App.—Fort Worth No. 2–85–290–CR, delivered March 30, 1989).

However, in *Jarmon v. State* (Tex.App.—Fort Worth No. 2–86–140–CR, delivered April 27, 1989) PDR pending, the court concluded the fact that the defendant was

---

**15.** Dissenting in *Black,* Justice Mirabal observed, "According to the reasoning employed by the majority, every time a sentence is assessed at over 60 years and the parole charge is given, there can be no harm." In her view, maximum punishment is "an indication that appellant suffered harm." Slip opinion at 1 and 3. Later, in *Villanueva* Justice Cohen discounted a like statement that maximum is indicative of harm made in *Urbano v. State,* 760 S.W.2d 33, at 39 (Tex.App.—Houston [1st] 1988) PDR pending; he explained "the significant factor in the harm analysis" there was that both counsel argued the parole law. Yet, in both *Black* and *Villanueva* the court assumed the jury understood that assessing maximum punishment would not delay "parole eligibility date." *Black,* at 4; *Villanueva,* at 680.

Given that assumption, a reviewing court might just as reasonably believe that jurors react with the sense of frustration exhibited by some prosecutors. In *Urbano,* directing attention to the § 4 instruction, he told them to have it read aloud in the jury room; on closing he reminded them of it and exclaimed, "He'll get

out some day. You can't stop that." *Id.,* at 38–39. Some demand maximum punishment regardless: Commenting that life will not be "enough" in that defendant could be paroled in twenty years, prosecutor asked, "Isn't that sickening?" and urged jurors to impose the maximum, then write their senator to inquire, "Why can't I give more?" *Joslin v. State* (Tex.App.—Dallas No. 05–85–01222–CR, delivered March 28, 1989) PDR pending. "There is no such thing as life without parole," *Woods v. State,* 764 S.W.2d 281, at 283 (Tex.App.—Houston [14th] 1988) no PDR; "There is no such thing as life. More than sixty years, that is insanity." *Howell v. State,* 757 S.W.2d 513, at 518 (Tex.App.—Houston [1st] 1988) PDR refused; see also cases discussed in Part II B 3, *ante.*

**16.** We observe the flaw in that analysis is that § 4(a) provides, "If the defendant is sentenced to a term of less than six years, he *must serve at least two years* before he is eligible for parole." Good conduct time is not available when there is an affirmative finding of deadly weapon. See Article 42.18, § 8(b).

"technically eligible for probation has no correlation to the [§ 4] instruction," *viz:*

"If the jurors had desired Jarmon be granted probation, they knew they could impose a sentence of not more than ten years; the parole instruction in no way affected Jarmon's eligibility for probation. The jury was obviously persuaded by the State's argument that one who participated in a planned armed robbery resulting in death should not be granted probation."

*Id.*, slip opinion at 4–5. Comments in the first sentence are true but not dispositive; the deduction in the second may be.

Our view is that what is not seen as correlative in one case may be more apparent in another. Thus in *Fonseca v. State* (Tex.App.—Corpus Christi No. 13–86–011–CR, delivered February 9, 1989), Appellant's PDR refused, where the offense was sexual assault, a second degree felony, application for probation, along with a § 4(a) instruction, was submitted to the jury, but it rejected probation and assessed punishment at twelve years, the prosecutor discussed the instruction and "asked the jury to 'consider the manner in which the parole law may be applied to this particular defendant.'" The Corpus Christi Court was unable to find beyond a reasonable doubt that the erroneous charge made no contribution to the punishment assessed. *Id.*, slip opinion, at 3.[17] See also *Early v. State*, 779 S.W.2d 79 (Tex.App.—Houston [1st] 1989) (application for probation supported by ten "quality" witnesses; jury assessed six years confinement, making defendant eligible for parole after two years) PDR pending; *Bonner v. State*, 779 S.W.2d 81 (Tex. App.—Houston [1st] 1989) ("candidate for probation or minimum sentence (five years) under these facts" given a relatively light sentence "evenly divisible by three and exactly triple the minimum sentence of five years") PDR pending.

We conclude that in a given case a correlation between probation and a § 4 instruction may appear.

Finally, there is that unusual situation in which an accused is convicted in one trial of two or more violent offenses involving multiple victims, and the jury assesses various punishments. See, e.g., *Johnson v. State*, 768 S.W.2d 788 (Tex.App.—Dallas 1989) (reversed) PDR refused; *Hartley v. State*, 765 S.W.2d 883 (Tex.App.—Dallas 1989) (affirmed) PDR refused; see also *Shaw v. State* (Tex.App.—Fort Worth Nos. 2–86–036–CR & 2–86–073–CR, delivered April 27, 1989) (reversed) PDR pending, on remand of *Shaw v. State*, 729 S.W.2d 134 (Tex.App.—Fort Worth 1987), per *Shaw v. State*, 761 S.W.2d 9 (Tex.Cr.App.1988).[18] We observe,

---

17. While the court did not elaborate, one way of analyzing the relevant factors is that, having calculated under the "one-third rule" and applied it to defendant, as the prosecutor requested, jurors decided that requiring him to earn fours year in confinement was preferable to a term of probation. See *Barreda v. State*, 760 S.W.2d 1, at 3 (Tex.App.—Corpus Christi 1987) ("By rejecting probation, the jury apparently wished to incarcerate appellant for a period of time in excess of the minimum punishment available.") PDR refused, *Ibid.*

Compare *Chavana v. State* (Tex.App.—Eastland (No. 11–86–064–CR, delivered January 12, 1989), in which application for probation was before the jury, prosecutor drew attention to the § 4 instruction, particularly the "one third" rule, in juxtaposition with instructions about probation, told the Jury the State would not have a recommendation, but later rebuffed probation; all jurors signed the verdict assessing punishment at thirty years, adding a handwritten note, *viz:*

"This decision was reached after prayer and great consideration [with or in] the hope that the defendant will be able to be rehabilitated and returned to society as a useful contributing happy citizen."

Tr. 33. Arguably, they thus opted for parole over probation.

18. On remand, in an unpublished opinion the court summarized facts of both offenses, along with another one, *viz:*

"... Shaw fired an Uzi semi-automatic rifle into a karate studio, killing one person and wounding another. Testimony showed he was upset with the owner of the karate studio, with his wife, who had just left him, and with others. Shaw testified that he did not see anyone inside the studio. Within the following week Shaw appeared with the Uzi [and other weapons] in the foyer of his old high school. He fired the Uzi at [front] windows. He [relinquished the rifles] at request of the school principal. A coach took the pistol from him. Shaw was tried for criminal mischief for [that] incident in the same trial as [instant offenses], but he did not appeal [that] conviction." *Id.*, slip opinion at 2.

however, that feature seems to be dismissed as having no particular bearing on the outcome. Yet, jurors must have something on their collective mind to bring the jury to make those kinds of determinations. The question is whether it is the § 4 instruction.

It occurs to us that an analysis of punishments meted out may suggest further examination of the record to gain an insight for answering that question. In *Johnson v. State*, supra, each punishment is the maximum. In *Hartley v. State*, supra, a jury assessed the limit for but one of three offenses, and it is the least punishment. In *Shaw v. State*, supra, both punishments are less than the maximum. Degrees of offenses aside, what induces jurors to produce such results?

Defendant in *Johnson* accosted in turn several strangers and without provocation or justification shot and killed one person, shot and wounded another and shot at others; he was convicted of murder, attempted murder and aggravated assault. There were many references to the § 4(a) instruction, defense asking for no more than the minimum to give defendant hope for early release on parole, the State arguing on the facts for maximum punishment, explaining *all sentences would run concurrently and only a life sentence would give any assurance the defendant would be confined in prison for any length of time. Johnson*, at 789–790. More to its point, the prosecutor declared:

"... There has been no evidence on the stand that he would be rehabilitated, in fact, down at the Department of Corrections. What this tells you about is a bunch of silliness that goes on down there about good time. When five years comes up and they think he's got some good time, they're going to pop him back out."

*Id.*, at 790. The jury assessed maximum of life, twenty years and ten years, respectively.

In *Hartley* defendant and a companion encountered two women in a nightclub, and what was supposed to be "partying" with cocaine at his apartment turned into an ordeal of sexual assaults, aggravated kidnappings and aggravated sexual assault, defendant inflicting substantial bodily injuries upon his victims. The prosecutor told the jury: *"Every year you come down off a life sentence,* you're gambling with your safety and that of your families. The judge read to you what the parole law is. All you can do is sentence him." *Hartley*, at 885. The jury found appellant did not voluntarily release victims in a safe place, and assessed punishment at sixty years for each aggravated kidnapping, forty years for an aggravated sexual assault and twenty years for a sexual assault—only the latter being the maximum.[19]

Finally, looking at *Shaw*, we find a twentythree year old defendant convicted of murder, attempted murder and criminal mischief, and both parties approaching the § 4(a) instruction from their respective perceptions.[20] Thus for reasons given the de-

---

**19.** During deliberations the jury indicated it was puzzling over treatment of ranges of punishment, *viz:*

"Does the court enforce the larger of the four sentences given by the jury?

or

Are all sentences combined for a cumulative total?

| Ex. case | 1 | 20 yrs |
| " | 2 | 10 |
| " | 3 | 10 |
| " | 4 | 10 |
| | | 50 yrs |

Does the defendant serve 50 yrs or 20 yrs? Please clarify."

To which the judge responded, "The law does not permit the Court to answer your question."

**20.** Defense counsel recalled the age of defendant and explained the "one-third rule," figuring that at fortyone or fortytwo "he will be returning to society if you give him the maximum sentence;" he concluded, "But because you find out in here about the parole laws and because you know that he will have to serve at least one-third or up to 20 years, that gives you the real dimension of deciding how long he shall stay away from normal society." Apparently without differentiating offenses, counsel asked the jury to assess less than maximum.

The prosecution iterated that "all the law gives us to do in this case is take him out of society for 20 years," adding, *"That's what a life sentence will do in this case."* Then he said, "You're going to give the people of Tarrant County some faith in our jury system. The

fense urged less than maximum punishment, while the State pleaded for maximum for each offense. The jury assessed much less, *viz:* fortyfour years for murder, fifteen years for attempted murder and five years for criminal mischief.

In our judgment, in each case jurors did consider the § 4 instruction in assessing punishment in light of arguments made to them. Moreover, in such situations they seem to focus on the offense carrying the highest penalty, the others more or less falling in line below it. Harm thus attaches primarily to a greater offense and spreads to the lesser ones. In all events, we cannot declare that the § 4 instruction made no contribution to the punishments.

### C

The leading opinion on rehearing in *Rose* did not lay down a methodical approach to, nor pretend to formulate guidelines for, making that determination in other cases presenting *"Rose* error." See separate opinion of Teague, J., at 557. We are now undertaking to do that which on rehearing *Rose* the Court did not purport to do.

Examining the plurality review in *Rose*, we note that at the outset it acknowledged,

"We are unable to know what process the jury underwent in assessing punishment[,]" *id.,* at 554. Such an inability, of course, is one reason the rule places a burden on the beneficiary to show beyond a reasonable doubt that the error did not contribute to the verdict on punishment, and renders any harm analysis mostly speculative unless and until the State is able to discharge its heavy burden.[21] But the plurality announced that "the record in this case presents factors which indicate that the error was harmless." *Id.,* at 554. We address them *seriatim.*

### 1

■ First is an appellate "rebuttable presumption" that "a jury follows the instructions given by the trial judge *in the manner* presented." *Rose,* at 554, citing *Cobarrubio v. State,* 675 S.W.2d 749, 752 (Tex.Cr.App.1983). Analogizing "instructions to disregard," the plurality deemed it "particularly significant" that the "last word" was the "curative instruction" traditionally given before advent of § 4. *Rose,* at 554.[22] But to apply such a "rebuttable presumption" to *Rose* error presents knotty problems.

people don't know the most people can get is 20 years." Later he also told the jury:
"... All these three cases—all these three sentences are going to run at the same time. The most he can do is 20 years.... When we say life, send someone away for life, we don't mean life as we all know it. We mean a life sentence, and a life sentence, as you know, is 20 years. And that's all he's going to get out of this is 20 years.... All we can do is protect society for as long as we can, and a life sentence and a $10,000 fine is as long as we can do it for. That's 20 years. And 20 years on the attempted murder case which runs at the same time, but we can send a message. [And ten years for criminal mischief]."

21. As already pointed out *ante,* at 302, n. 7, both prosecutors made the point about "existence" of parole without referring to our law *eo nominee.* They traced his prior criminal record from being released from federal custody "on parole," committing other offenses while still in that status and then being released from TDC long before serving the sentence imposed; in asking for life in closing argument, among other reasons the prosecutor said that "it would give the people at the TDC the maximum time to

rehabilitate him [and] give us ... the maximum grace period way from Vernon Lee Rose." As we have determined *ante,* that kind of argument is one indicia of inducing jury consideration of the parole law instruction in assessing punishment. As such, it adds to the burden of the State.

22. There is, of course, a competing notion that a jury will consider a charge in its entirety. *Cobarrubio v. State,* supra, at 753 (McCormick, J., dissenting). Confronted with § 4 declarations about parole law and having been granted leave to consider its existence, rational jurors must be perplexed by being told they are not to "discuss" content of that which they are allowed to "consider"—just as some justices admitted they were in *Rose v. State,* 724 S.W.2d 832, at 846 and 850 (Tex.App.—Dallas 1986). (Ordinarily, however, a § 4 instruction is singularly complete and independent of any other part of a charge, so nothing else bears on the matter.)

Even so, the plurality was not content to rely solely on a "rebuttable presumption;" it went on to couple and bolster it with what were perceived to be aggravating circumstances. *Ibid.* (presumption that jury followed final "curative instruction" along with "particularly heinous facts" and prior criminal record).

Rule 81(b)(2) itself mandates an appellate "presumption" of harm from error in giving a § 4 instruction. *Mallory v. State*, 752 S.W.2d 566, at 569–570 (Tex.Cr.App. 1988); see *Hargraves v. State*, 738 S.W.2d 743, at 749 (Tex.App.—Dallas 1987) PDR refused. From that mandate it follows that the jury is presumed to understand that it "may consider the existence of the parole law and good conduct time" as declared in the preceding four paragraphs of § 4, yet also understand it is not to consider "the extent" good conduct time may be awarded or "the manner" parole law may be actually applied to defendant.

The State must demonstrate that the error is harmless. To say that the appellate "rebuttable presumption" may be utilized at once sets up opposing "presumptions." An appellate "rebuttable presumption" alone does not demonstrate beyond a reasonable doubt that an error made no contribution to punishment. But, if used, the effect is to shift to appellant the burden of demonstrating harm—contrary to the rule. See, e.g., *Francis v. Franklin*, 471 U.S. 307, at 319–325, 105 S.Ct. 1965, at 1973–1977, 85 L.Ed.2d 344, at 356–360 (1985). In our judgment, the presumption of harm in Rule 81(b)(2) must prevail over an appellate "rebuttable presumption" that experience with parole law teaches is more fiction than fact.

### 2

■ The "curative instruction" the *Rose* plurality found "particularly significant" is a standard admonishment trial courts tradi-tionally submitted to a jury that the Court accepted over the years, *viz:*

"You are further instructed that in determining the punishment in this case, you are not to discuss among yourselves *how long the defendant will be required to serve any sentence you decide to impose. Such matters* come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor of the State of Texas and *are no concern of yours.*"

*Id.,* at 554, and generally, at 532. While we have rejected its presumptive effect, that the jury was given that kind of "curative instruction" is a proper factor, among others, in a harm analysis for *"Rose* error." [23]

As is often shown in our records, however, "jurors cannot resist the temptation to discuss parole laws," *Rose,* at 536; *Keady v. State,* 687 S.W.2d 757 (Tex.Cr. App.1985), and cases cited *ante* at 298. When the record suggests that jurors did indeed succumb to that temptation, manifestly the "curative instruction" failed to accomplish its purpose, and loses its value as a probative factor. See *Hernandez v. State,* 774 S.W.2d 319 (Tex.App.—Dallas 1989) (reversed) PDR pending.

### 3

■ Another matter noticed in *Rose* is "particularly heinous facts of this case," *id.,* at 554. Of course, "heinousness," like beauty, is in the eye of the beholder. See *Godfrey v. Georgia,* 446 U.S. 420, at 429–430, 100 S.Ct. 1759, at 1765, 64 L.Ed.2d 398, at 406 (1980) (interpretation of like

---

**23.** In that connection we find in several opinions that some courts of appeals have construed and treated various parts of a § 4 instruction itself, particularly the final paragraph or the last two sentences thereof, as a "statutory curative instruction." See, e.g., *Blackwell v. State, supra,* at 11; *Carter v. State,* 770 S.W.2d 604, at 605 (Tex.App.—Fort Worth 1989) PDR pending; *Barehill v. State,* 782 S.W.2d 506 at 507 (Tex. App.—Houston [1st] 1989) PDR pending; *Montgomery v. State,* 760 S.W.2d 323, at 327 (Tex. App.—Dallas 1988) no PDR history; *Fambro v. State,* 751 S.W.2d 956, at 958 (Tex.App.—Eastland 1988) PDR refused.

Among other unpublished opinions also pending on PDR, see *Chavana v. State* (Tex.App.—

Eastland No. 11–86–064–CR, delivered January 12, 1989); *Meeks v. State* (Tex.App.—Texarkana No. 6–86–079–CR, delivered January 24, 1989); *Winton v. State* (Tex.App.—Texarkana No. 6–85–110–CR, delivered January 24, 1989); *Garcia v. State* (Tex.App.—Amarillo No. 07–85–0288–CR, delivered January 30, 1989); *Williams v. State* (Tex.App.—Dallas No. 05–86–00439–CR, delivered February 1, 1989).

We are firmly convinced that no part of a § 4 instruction can reasonably be characterized and fairly regarded as "curative." See *Rose* at 536–537, and our analysis *ante,* at 299–300; cf. *Rose,* at 554.

terms can only be subject of sheer speculation). With or without other facts of the case some appellate courts are treating what they regard as facts "militating in favor of a harsh sentence" as "ample evidence to support the jury's findings on punishment," e.g., *Lancaster v. State* 754 S.W.2d 493, at 496 (Tex.App.—Dallas 1988) PDR refused; "circumstances [to] support the sixty-year sentence assessed by the jury," *Baker v. State,* 752 S.W.2d 237, at 239 (Tex.App.—Fort Worth 1988) PDR refused; "overwhelming proof of guilt," *Diaz v. State,* 769 S.W.2d 307, at 308, 309 (Tex.App.—San Antonio 1989) PDR pending. Yet, sufficiency of evidence is a matter of little consequence in a harmless error analysis. *Satterwhite,* supra, 486 U.S. at 258, 108 S.Ct. at 1798, 100 L.Ed.2d at 295 (question not whether evidence sufficient to support jury's finding but whether State proved error did not contribute to verdict); *Olivarez v. State,* supra, at 115; see generally *Harris v. State,* supra. In *Diaz v. State,* supra, dissenting Justice Carr reasoned, *viz:*

> "... If a jury considers 'A' (evidence of guilt) and 'B' (existence of parole and good conduct time) in assessing punishment, that does not show beyond a rea-

sonable doubt that 'B' made *no* contribution to the punishment."

*Id.,* at 311 (his emphasis). We agree.

Beyond that, in context of a § 4 instruction "heinousness" is a slippery indicator for gauging how a jury evaluated conduct of appellant in assessing punishment.[24] In other words, to find the facts are so aggravating that the punishment is appropriate is simply not a satisfactory conclusion.

4

In like vein, the *Rose* plurality opined, "Compounding these facts surrounding the offense and subsequent arrest was appellant's criminal record," *id.,* at 554. "These convictions," according to the opinion, "most certainly ... contributed to the jury's assessment of punishment," *ibid.* However, that contribution to punishment "does not establish beyond a reasonable doubt that the erroneously given instruction made no contribution to the punishment." *Olivarez v. State,* supra, at 115. Arguably, in *Rose* consideration of "the existence of the parole law and good conduct time" could have just as well contributed to motivating the jury to assess "the maximum sentence, life in the Texas Department of Corrections," *ibid.* Exhibits of "prior criminal record" are available for scrutiny by jurors.[25]

---

**24.** Some judges seem to believe that heinousness, the hatefully and shockingly evil nature of an offense, is certain to motivate a jury to assess confinement at a long term of years, and thus find *"Rose* error" harmless when a jury verdict fails to reflect their own expectations. See, e.g., *Johnson v. State,* 774 S.W.2d 276 (Tex.App.—Beaumont 1989) PDR pending (seriousness of primary offense "clearly demonstrates" instruction harmless beyond a reasonable doubt, i.e., "The jury declined to assess the punishment at life confinement, but instead awarded only a term of 20 years and a fine of $20,000."); *Roberts v. State,* 763 S.W.2d 443 (Tex.App.—El Paso 1988) PDR refused; motion for rehearing pending ("If there is *any* doubt as to the sentence in this record, it relates to the jury's failure to assess life imprisonment, not the more lenient imposition of sixty years.") (emphasis in original); *Daniels v. State,* 1989 WL 34456 (Tex.App. —Houston [14th] No. C14-87-00694-CR, delivered April 13, 1989) (aggravated nature of offense "could easily justify harsher punishment" than twelve year sentence). That belief ignores reality—life or any term of years beyond sixty is

without affect on eligibility for parole—and discounts sophistication of jurors.

A more compelling supposition is that jurors thus motivated naturally will "attempt to delay the exercise of clemency powers or to avoid the possible granting of parole by increasing punishment in anticipation [that it will be granted]," *Sanders v. State,* 580 S.W.2d 349, at 351 (Tex.Cr.App.1978), and other courts are finding that on their own initiative (or led by argument of counsel) jurors can and do figure out the § 4 formula to fix punishment accordingly. See, e.g., *Olivarez v. State,* supra, at 115–116; *Gil v. State,* supra, at 109; see also *ante* at 305–06. The unconstitutional instruction sanctions that. *Rose,* at 537.

**25.** In *Rose,* the facts are that, as well as referring to earlier release on parole, see *ante,* n. 21, at 310, both prosecutors pointed out from such evidence, *inter alia,* that Rose had returned to Dallas from TDC twelve years after receiving twentyfive year sentence, thereby graphically demonstrating practical operation of the parole law, and asked the jury to assess punishment at life. *Rose,* supra, at 539 (Miller concurring).

As we have seen, then, on rehearing the *Rose* plurality found from the factors it addressed that "the error made no contribution to the punishment assessed," *id.*, at 554–555. It did not look for other germane factors; it addressed only the three and failed to rule out others. Therefore, while the plurality and concurrences were enough to affirm the judgment of the court of appeals, none purports to present a "pattern" harmless error analysis of *Rose* error—as done here.

### III

Although harm analyses of *Rose* error run the gamut, there emerge acceptable rationales for relevant considerations in applying Rule 81(b)(2). While we have prescribed an analysis herein, no court can lay down a "bright line rule" to measure the contribution a § 4 instruction will make to every result.[26]

**26.** In the abstract some factors identified in our review *ante* seem weightier than others. However, indicia of factors bearing on minds of jurors will vary qualitatively and quantitatively from case to case; some may be more powerful in one context than in another, and thus more likely contributing to the result in the former, but perhaps not in the latter. For examples, actions pointedly directing attention to parole law or a jury note requesting specific information concerning it, will strongly support an inference that the jury did indeed consider the parole law, and when it assesses a term of years consonant with the "one-third rule" there can be no doubt; on the other hand, an unsuccessful effort to introduce operation of parole law on voir dire or a bare allusion in argument to the § 4 instruction will hardly raise such an inference in the face of a *Rose* "curative" instruction, unless of course there are other indicia such as an argument demonstrating earlier practical operation of the parole law to defendant, a jury note or probable application of the "one-third rule."

**27.** Bearing on this task is *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). Under a statute the trial court instructed the jury *inter alia* that it must assess punishment (as an habitual offender) at forty years imprisonment. The Oklahoma Court of Criminal Appeals acknowledged the statutory provision was unconstitutional but nonetheless affirmed sentence, reasoning that Hicks was not prejudiced by impact of the invalid statute

In sum, the appellate undertaking is to assay extant factors and circumstances germane to punishment, as we have evaluated them, for a likelihood that constitutional error conducive to introduction of offending parole matters into environment of a punishment proceeding affected jury deliberations, and thereby influenced jurors in assessing the terms of punishment reflected in their verdict. The reviewing court must be able to say beyond a reasonable doubt that the error made no contribution to the verdict obtained. Rule 81(b)(2); *Chapman v. California,* supra.[27]

With that in mind, we now turn to the particular causes before the Court.

### A

#### *Arnold v. State*

These are two convictions for murder. The judgments were affirmed in an unpublished opinion in *Arnold v. State* (Tex.App. —Dallas Nos. 05–85–01245–CR & 05–85–01246–CR, delivered December 4, 1986).

"since his sentence was within the range of punishment that could have been imposed in any event [under another valid part of the statute]." *Id.,* at 345, 100 S.Ct., at 2229. The Supreme Court found a denial of due process, *viz:*

"... Had the members of the jury been correctly instructed in this case, they could have imposed any sentence of 'not less than ten ... years.' The possibility that the jury would have returned a sentence of less than 40 years is thus substantial. It is therefore wholly incorrect to say that the petitioner could not have been prejudiced by the instruction requiring the jury to impose a 40–year sentence. * * * * Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. [Such a defendant has a substantial and legitimate liberty interest constitutionally preserved against arbitrary deprivation by the State under authorities cited.] In this case Oklahoma denied the petitioner the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law."
*Id.,* at 346, 100 S.Ct., at 2229 (emphasis in original).

On remand for reconsideration in light of *Rose*, the Dallas Court, raising but, over a dissent, not deciding the question of burden of proof under Rule 81(b)(2), and relying exclusively on the *Rose* "curative instruction," again affirmed. *Arnold v. State*, 766 S.W.2d 852 (Tex.App.—Dallas 1989). Accordingly, we granted appellant's petition for discretionary review, and for reasons about to be given we will affirm its judgment.

### 1

Jeffrey Allen Licker, a practicing civil attorney and a heavy user of cocaine, determined that his former supplier, Koby Sandovsky, stole a safe from his home containing controlled substances, jewelry and cash money; Licker decided to confront Sandovsky and his girlfriend, Lesia Kahl, about the theft, and he hired appellant and another suspect to kill them after the confrontation. His plan went awry in execution, but appellant and his confederate managed to kill the victims by bludgeoning each with a hammer.

Appellant and Licker were jointly tried for the two murders.[28] Both were eligible and applied for probation. At punishment the State pretermitted evidence and rested; appellant and Licker presented relatives and other witnesses to prove up eligibility and to support their respective applications with general "character" evidence. After all sides closed the judge heard objections to the proposed charge of the court, particularly pertaining to alternative § 4 instructions depending on a deadly weapon finding.[29] Overruling those objections, the court submitted the applications to the jury, gave the § 4 instructions and added a traditional *Rose* "curative instruction."

In making their arguments all counsel seemed wary of limine instructions from the court.

First prosecutor cautioned the jury about the deadly weapon verdict; suggested that though defendants were different men engaging in different types of criminal conduct, each committed murder in his own way; discussed condition of the victims and reasons for punishments; he concluded, "the only thing you can do to assess a meaningful punishment to both these defendants in all four of these cases is to assess life punishments to protect Dallas County as much as it's humanly possible from these two and people like them."

Counsel for Licker discounted "an eye for an eye, a tooth for a tooth" in favor of "forgiveness and mercy," and concentrated on probation for his client; along the way he alluded to "availability of needed treat-

---

**28.** We glean from the docket sheet that Licker's recurring motions to sever for purpose of trial were denied. For purposes of appeal, however, the causes were effectively severed as the appeal of each defendant went its own way. While there is a common statement of facts, there is a separate transcript for each cause containing papers germane to that particular cause. Thus, we have been hampered in our understanding of certain pretrial and trial developments by absence of papers generated by and applying to Licker.

**29.** The record does not reveal whether parole law matters were mentioned during voir dire of prospective jurors.

Licker objected to any § 4 instruction, and the judge was inclined to sustain it until the State pointed out that § 4 used mandatory "shall charge" language and objected to taking it out. In the ensuing colloquy Licker adopted additional more specific objections to be made by appellant except "with regard to a deadly weapon which is not applicable to our case," and moved in limine that the Court instruct counsel for appellant "not to discuss the possi-

bility that his client would not get good time and that my client would;" counsel for appellant protested that he "should be able to argue any law in front of the jury." Whereupon the court granted a motion in limine applicable "to all of the lawyers in all of the cases," *viz*:

"... to any discussion of the parole law other than to inform the jury, if you wish to do so, that there is a parole law; and that it's set out in the Court's charge; but under the mandatory language of the statute, they're also instructed ... that they are not to consider the manner in which the parole law may be applied to this particular defendant, so ... you may mention that there is a parole law and may cover that in your argument that there is such a law; but you may not make any argument that would indicate how it might apply to either your case or some other defendant's case."

Counsel for appellant then made many objections to the instructions on parole. (V S.F. 1709–1715).

ment sources in the community," and argued:

"... Send him to the penitentiary, you send him to the penitentiary, life, he's not going to be there for life. Okay. So the question is what are you going to do with a person that you really can't get rid of.

Now, the prosecutor's just going to want y'all just throw him away, get rid of him, but these people ultimately come out; and the question is do you want them to come out the way they come out from the penitentiary or do you want them to come out so that they're going to be able to fit in society, so we don't have any problems like this any more. That's the hard issue; that's what you've got to determine."

For his part, attorney for appellant also talked about objectives of punishment, but candidly told the jury that in his opinion, "for what it's worth, [appellant] should go to the penitentiary." He suggested a formula, *viz:*

"If you sent [appellant] to the penitentiary for 5 years, he would go down there. You know, there's something on parole. Y'all read that so you will understand it better, but he would go down for 5 years ...—let's send him down ... for the girl, because it just goes against the grain for somebody to hurt a girl, I don't care if they are drug dealers; but on the man, let's give him a ten-year sentence in the penitentiary and then probate it, so when he gets out of the penitentiary, whether he serves his full 5 years or what, he's not loose. We'll watch him. He's still on probation ... and if he ain't straightened his act up, that probation can be revoked and he can go down for another ten."

In closing argument the last prosecutor doubted that rehabilitation would work for these kinds of killers, disputed the notion that because victims may be "dope dealers" different considerations apply, urged jurors to tell them to get out and stay out of Dallas by rejecting appellant's proposed formula and assessing life sentences in

these cases, and add on for Licker fines of $10,000.

During its deliberation the jury asked the judge to identify the case numbers pertaining to "the female," and the court complied.

Against appellant, the jury found he used a deadly weapon and assessed punishment at thirty years for murder of Sandovsky, and life for murder of Kahl.

For Licker, it assessed punishment of ten years confinement and a fine of $10,000 for death of Sandovsky, and ten years probated and a fine of $10,000 for death of Kahl.

2

■ We granted review in these causes to determine whether the appellate court correctly construed and properly applied Rule 81(b)(2) in finding that the unconstitutional § 4 instructions made no contribution to the verdicts on punishment. In that it was content to rely solely on a "presumption" that the jury followed traditional *Rose* "curative instruction," for reasons stated in Part II *ante*, we conclude the court fell into error.

Because Rule 81(b)(2) mandates an appellate presumption of harm from error in giving a § 4 instruction, and because the State must demonstrate that the error is harmless, the presumption of harm in the former prevails over an appellate "rebuttable presumption" that "a jury follows the instructions given by the trial judge in the manner presented." *Ante*, at C 1. That a "curative instruction" was given is, however, a proper factor in a harm analysis unless the record suggests that the jury did indeed consider the parole law in assessing punishment. *Ante*, at C 2. Thus we must examine the record for indicia of factors reasonably conducing to affect minds of average rational jurors in their determination of punishment. *Ante*, at 300.

In the instant causes, the Court confronts a rare situation: a jury assessed disparate punishments against two defendants for the part each played in murdering two victims. Manifestly the jury deter-

mined the degree of their respective culpability was unequal.[30]

We have reviewed every germane revelation in this record and are satisfied that they did not influence the jury adversely to appellant in assessing punishment.

The trial judge imposed his own limitations on commenting about parole law; defense counsel objected to any § 4 instruction and stayed within the bounds of comment; the State persistently pleaded for life sentences in all four cases, while counsel for Licker focused on probation and counsel for appellant conceded his client was due some time in the penitentiary for killing Kahl but requested the jury follow that with probation in the other case; in its only note the jury asked for and got case numbers relating to Kahl; its assessment of life against appellant and ten years probated against Licker for the death of Kahl appears to reflect the jury made a reasonably consistent assay of criminal responsibility of each, see n. 30, *ante*, as does ten years and thirty years confinement, respectively, in the Sandovsky cases; unlike a "pattern" indicative of consideration of parole, cf. cases at 308–310, *ante*, nothing here suggests the life and thirty year terms have any correlation.

Thus we determine and are able to declare beyond a reasonable doubt that § 4 instructions made no contribution to the punishments. The judgment will be affirmed.

## B

### *Gaines v. State*

This a conviction for aggravated sexual assault; the jury assessed punishment at twentyfive years. The judgment was af-firmed in a published opinion. *Gaines v. State*, 723 S.W.2d 302 (Tex.App.—San Antonio 1987).

On remand for reconsideration in light of *Rose*, the San Antonio Court, with one justice concurring, concluded the jury was not "influenced by the parole law instruction" because the trial submitted the "statutory curative instruction" (last two paragraphs of § 4), which the concurring justice discredited), the offense was a traumatic crime of violence, the jury assessed "less than one-third of the possible range of punishment," and again affirmed the judgment. *Gaines v. State* (Tex.App.—San Antonio No. 04–86–00199–CR, delivered January 18, 1989). Accordingly, we granted appellant's *pro se* petition for discretionary review, and the cause was submitted on brief of his court appointed counsel; the State relied on its brief below. For reasons discussed *post* we will affirm the judgment.[31]

## 1

The ten year old female victim, Crystal, ran away from home about eight o'clock at night and began hitchhiking in a residential section of San Antonio; after she was picked up by adult male, one Paez, and agreed to "make sex to have a place to stay," he pulled into a driveway, got out and talked to appellant; shortly all three were in a vacant house formerly occupied by Paez. First Paez had deviate sexual intercourse and sexual intercourse with her and left; then appellant engaged in sexual intercourse and left, but later returned with pillow, blanket and flashlight, and had intercourse with her again; he left and returned with some food. The victim fed

---

**30.** While we merely sketched out the factual situation in light of findings of guilt supported by evidence, see *ante* at 314, it may be pertinent that Licker testified in detail to his scheme to confront Sandovsky about theft of his safe, but he denied that his plan involved killing him. (*Licker v. State*, Tex.App. slip opinion at 5). Furthermore, an accomplice admitted there was never a plan to kill any woman (3 S.F. 819); he testified that he and appellant armed themselves with a hammer and waited in an upstairs room, that Sandovsky was "sent" in there by some one other than Licker and they beat him to death, that appellant left but soon returned with Kahl and both bludgeoned her to death. (*Id.*, at 10–11)

**31.** Our summary of the facts of the case and of the evidence is taken primarily from the unpublished opinion of the San Antonio Court, supplemented by testimony from statement of facts that we deem helpful in understanding certain aspects of the criminal episode and positions of the participants, and in resolving the issue of harm under Rule 81(b)(2).

the food to a dog, departed the premises and was on her way back home when a police officer on the lookout for her stopped and took her home around three o'clock in the morning. She made prompt outcry to her mother.

Appellant was tried alone. Paez was a codefendant, but entered into a plea bargain on the eve of trial. Voir dire of prospective jurors is not in our record. Appellant presented witnesses to set up a sort of alibi defense and, testifying on his own behalf, denied committing any offense. However, on rebuttal the State called Paez further to implicate appellant; during crossexamination he said that he had been promised ten years for his part in the episode.

Appellant was eligible and applied for probation. At punishment the State reoffered all prior evidence and rested; appellant offered witnesses as to his character for being peaceable and law abiding. The trial court submitted his application for probation to the jury and, without objection, included a § 4(a) instruction. It did not contain a traditional *Rose* "curative instruction."

The State waived opening argument.

At the outset counsel for appellant told the jury he had elected to have it assess punishment, and requested jurors "to grant his motion for probated [sentence]," asking that they "give him no more than ten years, anywhere from five to ten years." He went on to justify that request, assuring the jury that if probation is revoked appellant will be committed to TDC for the period of punishment imposed. Counsel never alluded to § 4(a) instruction or parole.

For its part the State asked jurors to reconsider the evidence previously admitted during guilt phase and told the jury punishment is "entirely up to you." The prosecutor restated range of punishment for a first degree felony, explaining that a wide range enables them "to take the facts of the case and find an appropriate slot in between." She knew that "all of you are going to consider what is going to happen to the Defendant," but asked they not forget that

"he's here not for what is going to happen to him but for what he did," and then proceeded to reprise the facts and circumstances of appellant. She rejected probation, pleaded for "time to serve … so that he can have time to reflect on what he did," and made a bit of the "they" argument. Concluding, she recommended fifteen to twenty years, acknowledged that "whatever you give is up to you" and again urged them to "make him serve time." The State never alluded to § 4(a) instruction or parole.

The jury deliberated an hour and twenty minutes without seeking additional information before returning its verdict of confinement for term of twentyfive years.

2

■ We granted review in this cause principally to determine whether the appellate court correctly regarded the last two paragraphs of a § 4(a) instruction as a "statutory curative instruction." That consideration and that "aggravated sexual assault is a crime of violence," that the victim expressed "fear for her safety as to the co-defendant" and "continues to suffer from the trauma," brought the appellate court to conclude that "assessment of punishment at less than one-third of the possible range of punishment with no fine does not reflect [jurors] were influenced by the parole law instruction." Slip opinion, at 3–4.

The concurring justice disagreed that "the statutory instruction submitted here … is the same 'curative' instruction the Court of Criminal Appeals found 'particularly significant' in *Rose*," and referred to the earlier opinion of the court in *Olivarez v. State*, 756 S.W.2d 113, at 115 (Tex.App. —San Antonio 1988) no PDR. For reasons stated *ante* under II C 2, n. 23 and accompanying text at 311–312, the concurring view is substantially correct; we have determined that "no part of a § 4 instruction can be reasonably characterized and fairly regarded as 'curative.'" *Ibid.*

The jury may well have taken into account the other matters mentioned in the

opinion below, but this Court now proceeds on the premise that a jury may just as likely take into account the § 4 instruction and, therefore, examines the record "for indicia of factors reasonably conducing to affect minds of average rational jurors in their determination of punishment." *Ante,* at 300–301.

In this connection, appellant pro se recognizes and acknowledges that "both from the argument of the State's attorney and the sentence assessed by the jury, that there was never an intent to give a maximum sentence." PDR, at 5. Nevertheless, he contends that the instruction influenced the jury because "two of the three factors suggested by the [*Rose* court on rehearing] in determining 'harm' [are] absent in the present case," to wit: no prior criminal record and no "curative instruction." *Ibid.* His attorney makes much the same argument. Appellant's Brief on the Merits, at 4.

But as we have made clear in this consolidated opinion, "there are other revelations for examination pertinent to the [ultimate] inquiry." *Ante,* at 300 and see Part II B. So we have reviewed this record to find that the only mention of parole is in the § 4(a) instruction; otherwise there is not even an allusion to it by any trial participant, and perforce no indicia of factors inducing jurors to consider parole law. Thus that appellant had no prior criminal record and that the trial court did not give a "curative instruction" never becomes germane to the inquiry.

Accordingly, we are satisfied that the fact the jury rejected appellant's application for probation and assessed punishment somewhat higher than sought by the State does not indicate it was operating under influence of the § 4(a) instruction. Thus we determine and are able to declare beyond a reasonable doubt that § 4 instruction made no contribution to the verdict on punishment. The judgment will be affirmed.

## C

### *Hooper v. State*

This is a conviction for aggravated assault; finding a repeater allegation "true,"

the jury assessed punishment at twenty years plus a $10,000 fine. The judgment was affirmed in an unpublished opinion. *Hooper v. State,* 1987 WL 11568 (Tex.App.—Houston [1st] No. 01–86–00487–CR, delivered May 28, 1987). On remand for reconsideration in light of *Rose,* noting a "curative instruction" had not been given and that the State discussed the parole laws, the Houston (1st) Court concluded it was unable to find beyond a reasonable doubt that the erroneous charge made no contribution to punishment, and set aside the punishment. *Hooper v. State,* 1989 WL 27549 (Tex.App.—Houston [1st] No. 01–86–00487–CR, delivered March 23, 1989). Accordingly, the Court granted the State's petition for discretionary review, and for reasons hereafter given, we will affirm the judgment.

### 1

After an earlier encounter elsewhere, Michael Todd Elkins, and a small group including Terrie Calhoun went by a country western club but decided to go to his apartment; outside the club Elkins observed Calhoun in conversation with a wrecker truck driver, later identified as appellant; Elkins collected the others and with Calhoun drove away in his pickup; appellant followed in the wrecker. At his apartment complex, Elkins pulled into his assigned parking space; appellant drove up behind and blocked his pickup, got out with a shotgun, loaded a round and pumped it into the chamber, accosted Elkins with threatening expressions and then struck him about the face and neck with the barrel of the gun. When other lights in the complex came on, appellant said, "I know where you live. I will come back and get you." Hollering out to Calhoun, "I am not through with you yet," appellant got in the wrecker and left.

The indictment alleged that appellant did intentionally and knowingly threaten imminent bodily injury to Elkins by using a deadly weapon, namely a firearm. There are no pertinent pretrial motions, and during voir dire counsel did not refer to parole

law. In its verdict of guilt the jury found appellant used a deadly weapon.

At punishment, over several objections, the State proved up two pen packets: one for theft in 1975, the other alleged for enhancement, aiding felony escape in 1971, as well as four other contemporaneous offenses. Defense called three "character" witnesses, including a Montgomery County deputy sheriff, who testified favorably about circumstances of appellant. Appellant leveled several objections to the § 4(a) instruction.[32]

The State waived opening argument.

Counsel for appellant explained he had taken certain positions for technical reasons, summarized testimony of witnesses vouching for appellant, discussed "stale" prior convictions in pen packets and suggested his client had reformed, and concluding with the thought that a high sentence would "take away any hope," he asked for two years.

The prosecutor closed by showing he had proved the repeater allegation, requested the jury to think of victims of crime, especially Elkins, summarized and commented critically on offenses reflected in pen packets, noted the short time between convictions in 1971 and coming to Harris County, committing another offense in 1975, being sentenced to eight years in 1977 but then being released and committing the instant offense which he highlighted, and suggested that notwithstanding views of friends from Montgomery County appellant must pay for what he did in Harris County. He then addressed the § 4 instruction, as reproduced in the margin.[33] He urged jurors to send a message, and concluded that "the only form of justice that is allowable in this particular case based upon the facts and also those penitentiary packets is twenty years in the Texas Department of Corrections and a ten thousand dollar fine. Thank you."

During its deliberations over some two hours the jury sent out a note: "Jury requests pen packets for study." It assessed maximum punishment.[34]

## 2

We granted review in this cause to determine whether, as the State asserts, the appellate court "erred in concluding that the inclusion of an instruction on parole was not harmless beyond any [sic] reasonable doubt." PDR at 1.[35] In urging

---

32. *Inter alia,* appellant protested the third paragraph "unfairly inform[s] the jury that the defendant may receive parole ..., would be prejudicial and harmful, and that should play no part in the jury's consideration in assessing a punishment in this case," which the trial judge sympathetically overruled: "I wish you would deliver that argument to the legislature[.]"

33. "Also referring to the charge and reading from the charge, it states: That *the defendant,* if sentenced to a term of imprisonment, may earn time off the *sentence imposed* through the award of good conduct time. And also reading from the charge: 'It's also possible that the length of time for which a defendant will be imprisoned might be reduced by the award of parole. And also the judge has *instructed you* that you may consider the *existence of the parole law and good conduct time.*

Ladies and gentlemen, the defendant knew what happened to people who break the law. He had gone through it several times in the past and he did it anyway. And he come into our county and did it.... And the next time ... you hear about ex-cons committing violent offenses and you think: What are they doing out? Why did they get such little time and now they

are out doing this again. * * * * Don't say that to yourself if in *this particular case* you do not sentence *this defendant to the maximum....* And I want you to also refer back to those penitentiary papers."

34. Appellant timely filed motion for new trial alleging, *inter alia,* that "the Jurors entered into a discussion of parole law and discussed the amount of time the Defendant would be required to serve on any sentence assessed by them. Further the Jurors took into consideration and had discussions and did consider the fact that the Defendant, if paroled, would serve considerably less time in the penitentiary than the time assessed by them[.]" Because the court was otherwise occupied, a hearing was never held, and the motion was overruled by operation of law.

35. Revising and extending its appellate brief on remand to the court of appeals, the State surveyed views expressed by various appellate justices, and remarked that "these opinions cannot be resolved [and] the law is in a state of confusion." *Id.,* at 3. See, e.g., *Brooks v. State,* 768 S.W.2d 481 (Tex.App.—Houston [1st] 1989) (O'Connor, J., dissenting, at 483) no PDR; *Payne*

this Court to grant review, the State notes the "problem" of "plac[ing] the burden on the State and at the same time apply[ing] the presumption," posed by Justice O'Connor in *Brooks,* supra, at 485, and "heartily concurs in her assessment of the judicial quagmire which has followed this Court's decision in *Rose v. State,* supra." PDR, at 10. It recognizes that the appellate court "was forced to grapple with issues not yet fully resolved by this Court."

We have grappled with those issues and others in this consolidated opinion, and believe this Court has resolved most if not all of them. Having also reviewed every germane revelation in this record and evaluated them in light of views expressed *ante,* and taking into account the "combination of factors" considered by the appellate court, we are satisfied that the court properly concluded it was "unable to find, beyond a reasonable doubt, that the erroneous charge made no contribution to the punishment."

Accordingly, the judgment will be affirmed.

### D

#### *Payne v. State*

This is a conviction for murder; finding an allegation of a prior conviction "true," the jury assessed punishment at life. The judgment was affirmed in an unpublished opinion. *Payne v. State* (Tex.App.—Dallas No. 05–85–01244, delivered December 9, 1986). On remand for rehearing in light of *Rose,* a divided Dallas Court, generally taking the *Rose* approach on rehearing, over vigorous dissent, held beyond a reasonable doubt that the error made no contribution to punishment, and again affirmed the judgment. *Payne v. State* 766 S.W.2d 585 (Tex.App.—Dallas 1989). Accordingly, we granted appellant's petition for discretionary review. We will reverse its judgment.

The indictment alleges, and the State proved, that on or about July 15, 1985, appellant shot and killed Edward Hayes, Jr. with a handgun, and that previously, on September 13, 1982, appellant had been convicted for burglary of a building. Bare facts of the primary offense are capsuled in the opinion below at 586, to which we add only that appellant was accompanied by his uncle whose sister, an aunt of appellant, had been killed by a brother of deceased some three hours earlier just across Silkwood Street.

There are no pretrial motions of consequence; general voir dire was not taken by the court reporter, nor was she requested to transcribe individual questioning of prospective jurors.

The proposed charge on punishment contains a § 4(a) instruction and a part submitting the issue of use of a deadly weapons. Appellant objected to both, particularly the last paragraph of the instruction. There was no *Rose* "curative instruction."

In addition to a burglary offense alleged for enhancement, the State proved up three misdemeanor convictions, to wit: class B theft, October 1984; assault, October 1984; and disorderly conduct in November 1984. Appellant presented two character witnesses who testified that his reputation for being peaceable and law abiding was good.

Opening prosecutor recounted evidence of prior convictions, called attention to the special deadly weapon issue and asked jurors to find for enhancement and affirmatively on the issue, and assess punishment at life. Counsel for appellant tried to raise doubts about reliability of records connecting appellant to prior misdemeanors, discussed objectives of punishment and reminded jurors they were qualified on the full range, and asked them to consider it in light of all evidence presented. Closing

---

*v. State,* 766 S.W.2d 585 (Tex.App.—Dallas 1989) (Enoch, C.J., concurring and supplying emphasis, at 587 ["harm, resulting in reversal, is not present in the absence of *other factors* that create reasonable doubt that the charge had no impact on the sentence imposed"] ) PDR granted, see *post; Watley v. State,* 1989 WL 27215 (Tex.App.—Houston [1st] No. 01–86–00355, de-

livered March 23, 1989) (Cohen, J., dissenting [while speculative in every decision whether *Rose* error harmless, seems more likely instruction did affect deliberations] ) PDR granted; *Carson v. State,* 765 S.W.2d 889 (Tex.App.—Dallas 1989) (court not required to be "absolutely certain" error did not contribute but to determine beyond reasonable doubt).

prosecutor vouchsafed the records and turned to discuss "what we are here for:" he recalled facts of the murder, asked jurors "to impose the maximum punishment in this case, which is life, to keep appellant off of Silkwood Street just as long as we possibly can," to take the photograph of deceased into the jury room and "consider him when you consider what to do with [appellant]." Parole law was not mentioned in argument at all.

·After the jury retired to deliberate, as well as requesting exhibits "used as evidence in the punishment phase of the trial," *viz:* numbers 21–30, being records of prior convictions, it sent out a separate note inquiring, "What is the earliest possible parole on a life sentence?" The trial judge responded:

> "You are instructed to consider only the evidence you have received from the witness stand along with the exhibits admitted into evidence and the law applicable to this case which is contained in the Court's Charge."

The jury assessed punishment at life.

### 1

■ We granted review in this cause to determine whether the divided appellate court correctly construed and properly applied Rule 81(b)(2) in finding that the unconstitutional § 4(a) instruction made no contribution to the verdict on punishment. In that the lead opinion considered only the facts surrounding the offense and prior criminal record "(revealing a propensity for violence)," *Payne*, at 586; the concurring opinion found no evidence "militates against the full sentence authorized by law," "presumed" the jury followed the instruction given in response to its inquiry about "earliest possible parole," discounted lack of a *Rose* "curative instruction"—"it just happened to be a circumstance that existed in *Rose*"—regarded the last two sentences of § 4(a) instruction as "curative" and considered "the other factors appearing in the record," *id.,* at 588, for reasons stated in Part II *ante,* we conclude the court fell into error.

That an appellate court believes facts of an offense are heinous and a prior criminal record shows propensity for violence cannot rule out that a jury may have taken into account a § 4 instruction in assessing punishment. Indeed, a jury holding similar views is just as likely to assess maximum punishment in order to compensate for the possibility of parole.

As we confirmed in *Arnold,* supra, the appellate presumption of harm mandated by Rule 81(b)(2) prevails over an appellate "rebuttable presumption" that a jury follows instructions given in the manner presented." See also *ante,* at C 1. Here even the lead opinion concedes their note "shows [jurors] were considering the parole instructions included in the charge," *Payne,* at 586. That revelation alone refutes a notion in the concurring opinion that any part of § 4 instruction is "curative." See n. 23, *ante,* at 311. Moreover, it demonstrates the futility of reinstructing this jury to "consider ... the law applicable to the case ... in the Court's Charge" that jurors have already violated. We agree with the diagnosis in the dissenting opinion, *viz:*

> "... The court's reply *was not* an admonishment ... but was an additional and supplemental instruction to the jury to use the unconstitutional charge to answer their question. Therefore, we have a direct instruction from the court to use the statutorily mandated unconstitutional charge as the method to resolve their quandary and to ascertain or compute the earliest possible parole on a life sentence. This could only reinforce and encourage the jury to do exactly that and to utilize the time calculation set out in the offending charge in assessing punishment."

*Id.,* at 590 (emphasis in original).

But the lead opinion says, "[I]t does not necessarily follow that such consideration contributed to appellant's punishment in this case." *Id.,* at 586. However, the burden is on the State to demonstrate that such consideration did NOT contribute to it, and we are unable to determine and to declare beyond a reasonable doubt the er-

ror made no contribution to punishment assessed against appellant.

Therefore, the judgment will be reversed.

### E

### *Taylor v. State*

This is a conviction for arson in the first degree; the jury assessed punishment at fifteen years. The judgment was affirmed. *Taylor v. State*, 735 S.W.2d 930 (Tex.App.—Dallas 1987). On remand for reconsideration in light of *Rose*, the Dallas Court raised but did not decide which party had the burden under Rule 81(b)(2), and generally taking the *Rose* approach on rehearing concluded the error was harmless. *Taylor v. State*, 763 S.W.2d 926 (Tex.App.—Dallas 1989). Accordingly, we granted appellant's petition for discretionary review. For reasons about to be given we will affirm its judgment.

The indictment alleges, and by a developing mix of complex circumstances the State proved, that on or about March 8, 1985, appellant intentionally and knowingly started a fire by manner and means unknown to the grand jury with intent to destroy and damage a habitation within corporate limits of Rowlett, being reckless about whether burning would endanger the life of some person, and by reason of said fire four named persons suffered bodily injury and death. See *Taylor v. State*, 735 S.W.2d 930 (Tex.App.—Dallas 1987), for a comprehensive exposition of the facts of the offense and appellate rationale for concluding that the evidence was sufficient to connect appellant to the fire.

There were no pretrial motions relevant to our problem. Voir dire did not implicate parole laws. The jury deliberated almost five hours before finding appellant guilty, and then after an instruction in the nature of an *"Allen* charge." The verdict was returned on a Friday evening, and jurors were excused to begin punishment hearing earlier than usual on the following Monday.

At punishment the State reoffered prior evidence and rested. Appellant was eligible and had applied for probation; she presented a host of witnesses to support her application and to relate circumstances of her background and persona; appellant qualified herself for, and testified she would comply with conditions of probation. Over objection by appellant, the judge included in the court's charge provisions for finding whether "fire" is "a deadly weapon," and gave appropriate § 4 instructions, also over objections, dependent upon such finding; she objected to the *Rose* "curative instruction" for the reason that '[it] is in conflict with [§ 4 instructions], as it tells the jury to discuss it and then once again tells them not to discuss it[.]' "

First prosecutor conjured poignant impressions of what two children who died in the fire would never experience and accomplish, as well as how adult victims must have suffered, to make the point that here fire was a deadly weapon; he asked the jury to sentence appellant to confinement "for the rest of her life ... because that's the only thing you can do with her, ... so that the next time she has this urge to commit violence, no one else will be a helpless victim. Thank you."

Counsel for appellant expressed personal outrage at the verdict of guilt and urged the jury to grant probation; his concluding remarks epitomize his sense of injustice, *viz:*

"And I hope I haven't said anything to offend you, but I'm very offended with the whole process at this point. Tremendously, for the first time in my life. And if you're offended, you be made at me, but don't be mad at Peggy Taylor. I just had to decide what I had to argue, and this is what came from the heart. I'm very upset about this, and will be until I get it straightened out.

Thank you very much."

Second prosecutor began by faulting counsel for rearguing guilt and innocence, and turned to "talk about punishment;" he charged that appellant "decided to murder [her husband], apparently for money. Just money. Nothing more than that." He "would never argue that she intended to kill those children [but] she was willing to

put their lives in danger to kill somebody else [including a house guest]." He explained that the range of punishment for arson with bodily injury or death allowed leeway for the jury; because of any one death, he asserted appellant was not deserving of probation; her testimony that she was "sorry," was belied by a photograph of her "modeling for the trusties," alluding to an exhibit showing "the real Peggy Marie Taylor;" he asked the jury to decide "what four lives are worth in Dallas County." He concluded:

> "Don't tolerate this kind of conduct in Dallas County, do not tolerate children being sacrificed for such a low purpose as murder, and that is what this is. It's killing children in order to accomplish killings, the most base, the most vile, the most unacceptable of all purposes for committing crime in our county. I'd ask you to give her a life sentence, because that's exactly what she deserves in this case.
>
> Thank you."

The jury began its deliberations shortly before noon on Monday and in an hour recessed for lunch until 1:30 p.m. As we understand the record jurors disagreed early on, a series of exchange of messages with the judge ensued, jurors had dinner and resumed deliberations, later appellant moved unsuccessfully for mistrial, the jury was sequestered overnight and finally returned its verdict on punishment at 11:15 a.m. on Tuesday.[36]

**36.** The exact sequence of messages is not that clear from the record, but the following reconstruction is close enough for our purposes.

Shortly after returning from lunch the jury reported, "We are in a deadlock on punishment." At 2:15 p.m. the court directed: "Please continue to deliberate." A note at 5:15 reported, "[Jurors] are firm in their individual opposing opinions[.] All arguments have been exhausted and no progress can be made. * * * *" The Court explained why the jury should continue deliberating, and requested to know "the numerical split" and whether it had changed since beginning deliberations. Response at 6:11 p.m. was that the split "is 8–4 and this represents a change from 11:36 a.m." At 6:55 p.m. the jury went to dinner, returning at 8:45 p.m. Later on, about eleven o'clock, the court inquired whether the numerical split was "still 8–4," informing the

---

1

We granted review to resolve the issue of burden of persuasion under Rule 81(b)(2) and to address the harmless error analysis conducted by the appellate court. Having already determined that issue *ante*, in Part I at 4, and applied the rule in e.g., *Arnold*, supra, we turn to the analysis.

The court of appeals was persuaded by "the same two circumstances that were persuasive to [this Court] in *Rose*," towit: "the facts of the offense militate in favor of a harsh sentence [and] there is a curative instruction in the charge." *Taylor*, 763 S.W.2d, at 928–929. For reasons stated in Part II, *ante*, and in *Arnold*, supra, we conclude that analysis is faulty.

First, the court of appeals was impressed by the term of punishment, *viz:*

> ".... The jury assessed fifteen years for an offense resulting in the death of appellant's husband and two of her three children. The facts of the offense militate in favor of a harsh sentence, yet none was imposed. Instead, in this circumstantial evidence case, the jury assessed appellant virtually the minimum punishment for an offense resulting in the destruction of her family."

*Id.*, at 929. All this means is that the jury verdict fails to meet subjective expectations of the reviewing court, a matter discussed *ante* in note 24 and accompanying text, at 311–312 and also in *Payne*, supra, at 321 (facts of offense cannot rule out that jury may have taken into account a § 4

jury that plans must be made for overnight accommodations, that the jury could deliberate as late into the night "as the majority desires," but that there is a "fatigue level" making deliberations "non-productive," and requested to be notified when "the majority agrees that you have reached that point." In about fifteen minutes appellant moved for a mistrial on grounds that "any further deliberations would be coercive and in violation of due process[.]" Motion was denied, and at 11:30 p.m. the jury reported that the "numerical split has changed," they were ready to retire so to approach punishment "fresh tomorrow," however the jury "feels it is unlikely it will come to a unanimous decision at any time." The jury then recessed until next morning, and ultimately found fire was a deadly weapon and assessed punishment at fifteen years.

instruction in assessing punishment). Here, for reasons known only to the jury, it rejected the State's entreaty for a life sentence. Better than any other in the quintet of causes under consideration, this one demonstrates that juries do not always react as some judges might anticipate.

Second, in addition the court of appeals relied on the *Rose* "curative instruction" which we have denied status as a "rebuttable presumption," but accepted as "a proper factor in a harm analysis for *Rose* error." See *ante*, at 311–312.

In each circumstance the question remains whether the § 4 instruction induced the jury to assess the punishment it did. The trial court had to impress upon the jury the need for a verdict on the merits of the indictment. Thereafter, so far as the State and appellant were concerned the issue on punishment is either life in the penitentiary or probation for appellant— nothing in between—and it is obvious to us from exchanges of communications that jurors had great difficulty in reaching an agreement that rebuffed positions of both parties. We have examined the record for indicia of factors reasonably conducing to affect minds of average rational jurors in their determination of punishment, and have not found any calculated to influence the jury adversely to appellant in assessing punishment.

As in *Gaines*, supra, the sole mention of parole is in the § 4(a) instruction; otherwise there is not a hint about that subject from any trial participant.[37] Accordingly, we are satisfied that the fact the jury rejected her application for probation and assessed the punishment it did does not indicate it was operating under influence of the § 4(a) instruction. Thus we determine and are able to declare beyond a reasonable doubt that the instruction made no contribution to the verdict on punishment.

37. We concluded *ante*, at 307–308, that in a given case there may be a correlation between rejection of probation and a § 4 instruction. Here we have an application, abundant evidence supporting it and a strong plea for probation, but a punishment that the finding of deadly weapon rendered appellant ineligible for pa-

On those bases the judgment will be affirmed.

## IV

Accordingly, our disposition of these consolidated causes is as follows, *viz:*

In *Joel Gregory Arnold v. State*, Nos. 0482–89 & 0483–89, the judgment of the Dallas Court of Appeals is AFFIRMED.

In *Anderson Gaines v. State*, No. 0507–89, the judgment of the San Antonio Court of Appeals is AFFIRMED.

In *Edwin Francis Hoooper v. State*, No. 0627–89, the judgment of the Houston [1st] Court of Appeals is AFFIRMED.

In *Gary Wayne Payne v. State*, No. 0530–89, the judgment of the Dallas Court of Appeals is REVERSED and the cause is REMANDED to the trial court pursuant to Article 44.29(b), V.A.C.C.P.

In *Peggie Marie Taylor v. State*, No. 0373–89, the judgment of the Dallas Court of Appeals is AFFIRMED.

WHITE, J., not participating.

CAMPBELL, Judge, concurring.

While I agree with most of what Judge Clinton has written for the majority, I feel compelled to write separately for a variety of reasons.

These petitions for discretionary review were granted and consolidated in response to a perceived desire on the part of the bench and bar for additional guidance concerning application of Tex.R.App.Pro. 81(b)(2) to *Rose* error. As Judge Clinton's opinion ably demonstrates, various courts of appeal have, in spite of similar fact patterns, decided this issue in widely disparate manners. Such a state of affairs has caused dissension between the courts of appeals and uncertainty on the part of everyone affected.

role until she served five years. While one might conjecture that the jury settled for confinement followed by supervision on parole over supervised probation, without some indication that the jurors did consider the § 4 instruction, to say it did would be pure speculation.

Unfortunately, it is impossible to set out a step-by-step procedure that will automatically lead to an inerrant conclusion that the error was or was not harmful. Any harm analysis tends to be subjective and uncertain, but when a court is faced with *Rose* error, these inherent difficulties are exacerbated by the simple fact we are not privy to the jury's deliberations.[1] *Rose v. State*, 752 S.W.2d 529, 554 (Tex.Cr.App. 1988) (opinion on rehearing). Thus, we are forced to rely on circumstantial evidence in order to divine whether "the error made no contribution to the ... punishment." Tex. R.App.Pro. 81(b)(2).

Judge Clinton identifies a number of factors which will affect an appellate court's application of Rule 81(b)(2). These factors, briefly summarized, include: (1) what, if any, discussion of parole occurred during voir dire, (2) argument by counsel, (3) the existence of jury notes concerning application of the parole laws, (4) the actual sentence assessed (is it in accord with the facts of the case, does the number of years imposed suggest application of a one-third rule? etc.), (5) a deadly weapon finding, (6) the facts of the case, (7) prior convictions, (8) additional instructions concerning parole,[2] and (9) whether counsel objected to the parole instruction.

It is important to stress that these factors are neither exhaustive nor universally applicable. Every case will present a different set of circumstances. The majority opinion should not leave the impression that a laundry list of these possible factors should be checked off each time a court undertakes an 81(b)(2) analysis. Such an approach would lead, inevitably, to the type of confusion which has pervaded this area since we decided *Rose*.

Tex.R.App.Pro. 81(b)(2), which sets out the harmless error rule applicable to the instant case, states:

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgement under review, unless the appellate court determines *beyond a reasonable doubt* that the error made no contribution to the conviction or to the punishment. [emphasis added]

This standard for review is remarkably similar to standard, established by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1974), applied to sufficiency of the evidence cases, viz.

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a resonable doubt. But this iquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after view the evidence in the light mos favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a resonable doubt.

*Id.* at 318 (citations omitted).

In addition to an obvious similarity between these rules, an appellate court conducting a sufficiency review faces similar problems and temptations as a judge conducting a harm analysis. Such a judge is put in the position of trying to determine how the events of the trial affected the factfinder. While a judge conducting a

---

1. Even if we were able to listen to the jury deliberate, a discussion of the parole laws would not necessarily mean that the jury was affected by the discussion. Conversely, a jury could easily set a sentence, relying heavily on parole considerations, and never mention parole. The ultimate answer, whether the sentence was affected by the parole instruction, is locked within the minds of the individual jurors. And, even if we were to ask the jurors whether they were affected, many would probably be unable to answer definitively.

2. The majority opinion does state that the final paragraph of § 4 may never be considered as a "curative" instruction. I agree wholeheartedly. The curative instruction discussed in *Rose* did not appear in the statute and went far beyond the statute's ambiguous admonition not to consider parole. See the majority opinion at note 23.

sufficiency review may be tempted to substitute his or her opinion of the appellant's guilt for that of the factfinder, the standard of review, by its very terms, precludes such an approach. Likewise, a harm analysis under Tex.R.App.Pro. 81(b)(2) seems to invite the judge to question whether the error might have affected his or her reasoning. Again, 81(b)(2) prohibits such a substitution of the appellate perspective for that of the factfinder.

The notion of how to conduct an 81(b)(2) analysis was recently discussed by this Court in *Harris v. State* (Tex.Cr.App. No. 69,366 June 28, 1989) (not yet reported, pending on rehearing).

> Although Rule 81(b)(2) has been cited innumerable times by this Court as well as the courts of appeals, beyond simply repeating the language of the rule in conclusory terms, we have failed to articulate a coherent standard for determining when an error is harmless. In other words, the harmless error rule is expressed in conclusory terms that implicated subjective concerns. What is absent from the rule is the objective standards that must be explored to reach a legally correct resolution. In this regard it must be emphasized that the function of an appellate court's harmless error analysis is not to determine how the appellate court would have decided the facts, but to determine to what extent, if any an error contributed to the conviction or the punishment. The language of the rule dictates that a reviewing court's repsonsibility transcends determining whether the conviction was correct.

*Id.,* slip op. at 29–30. After setting out a number of factors that would suggest whether the error in *Harris* might have affected the jury, much has Judge Clinton has done in this case, the Court concluded:

> General consideration having been set out, we are left only to provide a skeleton on which to place them. A procedure for reaching this determination should: first, isolate the error and all its effects, using the considerations set out above and any other considerations suggested by the facts of an individual case;

and second, ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted.

*Id.,* slip op. at 36–37.

If this restatement of Rule 81(b)(2) is not helpful, it must be remembered that no harm analysis will be a simple, mechanical process, It, like the "outstanding reasonable hypothosis" standard applied in circumstantial evidence cases, is not a *different* standard. Instead it is a different way of looking at the *same* standard. See *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex. Cr.App.1983) (opinion on rehearing).

An 81(b)(2) analysis of *Rose* error should not be more difficult than testing the sufficiency of a circumstantial evidence case. The notions of proof and relevancy applicable to one case should easily translate into the other context. Hopefully, the majority opinion will be read as a comprehensive resource to reveal how various courts have dealt with this issue rather than a prescription of how to conduct the analysis itself.

McCORMICK, Presiding Judge, concurring and dissenting.

### A.

#### *Arnold v. State*

I concur in the result of the Court affirming the Dallas Court of Appeals based on my dissenting opinions in *Rose v. State,* 752 S.W.2d 529 (Tex.Cr.App.1987).

### B.

#### *Gaines v. State*

I concur in the result of the Court affirming the San Antonio Court of Appeals based on my dissenting opinions in *Rose v. State,* 751 S.W.2d 529 (Tex.Cr.App.1987).

### C.

#### *Hooper v. State*

I dissent from the judgment of the Court affirming the Houston [1st] Court of Appeals based on my dissenting opinions in

*Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App. 1987).

### D.

#### Payne v. State

I dissent from the judgment of the Court reversing the Dallas Court of Appeals based on my dissenting opinions in *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1987).

### E.

#### Taylor v. State

I concur in the result of the Court affirming the Dallas Court of Appeals based on my dissenting opinions in *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1987).

TEAGUE, Judge, dissenting.

I was under the impression that when this Court granted the petitions for discretionary review in the above cases, as well as others, it was the intent of this Court that it would give guidance through bright line rules to the courts of appeals of this State as to when "Rose" error would or would not call for reversible error, so that a certain amount of consistency would exist in this area of the law in all 14 courts of appeals. Sad to say, there is no such guidance in what has been written to date, and both the State and defendants are now going to be at the mercy of how the particular "jurors" of a particular court of appeals decide to vote whether or not the error was harmless under Rule 81(b)(2). Each case will therefore rest on its own merits and the winner will be decided by the equivalent of a coin flip.

In *Rose v. State*, 752 S.W.2d 529 (Tex.Cr. App.1987), on original submission, this Court declared Art. 37.07, § 4, V.A.C.C.P., unconstitutional as being in violation of the due course of law clause and the separation of powers doctrine of the Texas Constitution. The statute thus became void ab initio. The statute partially informed the jury in the abstract about some aspects of the law of pardons, paroles, and good conduct time. The jury was instructed, inter alia, that in assessing punishment it could consider aspects of parole law and good conduct time in assessing the defendant's punishment.

Judge Clinton, the author of the lead opinion in *Rose*, on original submission, pointed out therein that "Whether jurors actually did discuss and consider parole law and good conduct time, and to what extent and effect, can never be properly discovered and adequately determined." (at 537).

On rehearing, a majority of this Court rejected the *"Almanza"* charge test error, see *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985), in making the determination whether the unconstitutional instruction was harmless to the defendant, and opted to apply the Rule 81(b)(2) or "no contribution" test.

In the concurring and dissenting opinion that I filed on original submission in *Rose*, I opined that "before reversible error is shown to exist, it must be established that the instruction affected the fairness, integrity, or public reputation of the defendant's trial that it caused the trial to be labeled 'a miscarriage of justice.'" (542). In so stating, I overlooked the fact that under Rule 81(b)(2), whatever the error might be, it must not make any contribution to either the guilt or punishment phases of the trial.

Had the authors of the rule stated that the test would be "no substantial contribution", or words to that effect, then a different analysis would be proper to make. But, they didn't.

There is only one true way to conclusively resolve the issue, whether "Rose" error in the charge at the punishment stage of the trial is reversible error, and that is to have the jurors who heard the case, and are able to testify, testify whether the parole law instruction either did or did not make any contribution to their verdict on the punishment that was assessed. To require less amounts to little more than flipping a coin, guessing, or speculating on whether the jury actually considered the parole law instruction in assessing the defendant's punishment.

The majority opinion by Judge Clinton in this cause does not inform the courts of appeals, or members of the bench and bar

of this State, when "Rose" error will or will not be reversible error.

In *Rose,* by relying upon the facts of the case and the defendant's serious criminal record, I concluded that no miscarriage of justice had occurred, and with or without the instruction the jury's sentence would have still been life imprisonment. Of course, I was merely acting as a thirteenth juror might have acted in reaching this conclusion.

On this Court's own motion for rehearing in *Rose,* the unconstitutionality of the statute was reaffirmed. The first part of the opinion on rehearing was dedicated to the fact that a statute declared void is void ab initio "from its inception and cannot provide a basis for any right or relief." (553). The Court then discussed why it was applying the Rule 81(b)(2) "harmless error" analysis, and not the *Almanza* analysis, and concluded that the error was harmless. In so deciding, the majority opinion did not devise or create any all-inclusive or exhaustive list of factors; instead, it invoked several of the factors that are usually used in making the determination whether the error was harmless, namely: the facts of the case; the "ignore the parole law" rebuttal instruction that had previously been given, which instruction this Court presumed the jury followed; and the five prior serious felony convictions the defendant had sustained. Thus, it would appear that what the majority opinion did on rehearing was to give the defendant a bidet shower. Of course, the opinion could have placed other factors in the record to support the jury's verdict of 30 years' confinement in the Department of Corrections, to show that the error was harmless, but this would still not answer the "no contribution" issue in Rule 81(b)(2).

If the reader of the opinions filed in this cause is looking for an all inclusive or exhaustive "bright line rule" in making the determination whether "Rose" error is reversible error, see *Rose v. State,* opinion on rehearing, I believe that he will be terribly, terribly disappointed and and will eventually declare as Justice O'Connor did in the dissenting opinion that she filed in *Brooks*

*v. State,* 768 S.W.2d 481 (Tex.App.—Houston [1st Dist] 1989): "I do not understand how to apply the harm analysis the Court of Criminal Appeals tells us to use in *Rose v. State....*" (at 483). I, too, do not find anywhere in today's collective opinion or the individual opinions that have been filed anything that will give Justice O'Connor, other courts of appeals justices, or even judges on this Court any bright line rule. In fact, the lead opinion in this cause tells us as much: "There is no bright line rule." There is simply no way that anyone, especially an appellate court judge, can with confidence, and conclusively, without hearing from the jurors, determine that the error in giving the parole law instruction was or was not harmless to the defendant. We are relegated to a guessing game or speculating, acting much like a rational jury might act.

There is no real consistency between the decisions of the courts of appeals which have reversed because of the parole law instruction, and those cases which were affirmed by the courts of appeals. The "luck of the draw," as to which court of appeals the case was assigned the case, appears to be the deciding factor.

In virtually all of the cases, however, those both affirmed and reversed, the facts were heinous. However, as pointed out in *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284, the question is not whether the legally admitted evidence would support the punishment assessed but whether the State has proved beyond a reasonable doubt that the error made *no contribution* to the punishment that was assessed. Thus, as applied here, the issue is whether the State has satisfied its burden of proof beyond a reasonable doubt that the charge error made *no contribution* to the jury's verdict on punishment. Cf. *Harris v. State* (Tex.Cr.App.1989).

Although it is true that there is a presumption that the jury followed the trial court's instructions on the parole law, nevertheless, to say that a part of a jury instruction on a particular unconstitutional statute, or that a formerly approved in-

struction added to the unconstitutional statute cures the error is ludicrous. Furthermore, the State has the burden of proof, before it can rebut the appellate presumption of harm, to establish, beyond a reasonable doubt, that the jury did not literally follow every single word of the charge, including any so-called "curative" instructions that is found in some of the parole law instructions. It is simply asking too much of any lay juror to tell him to consider the parole law instruction and the effects of good time and parole but not to do so in the case where they had just heard the instruction given to them by the trial judge. To presume that the jury was able to accomplish these mental gymnastics and require the State to rebut the presumption is or should be both shocking and totally not understandable to the average person. What difference, given the fact that the particular instruction is to be read as a whole, can one say that the "weasle words," see *Garay v. State,* 755 S.W.2d 956, 957 (Tex.App.—San Antonio 1988), found in the last sentence of the "curative" instruction, have any meaning-one way or the other-to resolving the Rule 81(b)(2) harmless error issue?

Until the passage of Art. 37.07, § 4(a), it was impermissible, and usually reversible error, for the jury to consider the parole law or good conduct time in their deliberations on punishment. The Legislature, by enacting the implicated statute, however, saw fit to partially "enlighten" the jury on the parole law of this State. It failed dismally, and this Court correctly declared the statute unconstitutional. Not undaunted, the Legislature enabled the voters of this State this past November to approve a constitutional amendment, which appears at this time will cause a repeat performance of what occurred in the past in this and the intermediate courts of appeals of this State. See Art. 37.07, § 4, V.A.C.C.P., and Art. I, § 29, Texas Constitution.

In making the determination whether the "Rose" error jury instruction is reversible error, the question is actually what effect or impact the instruction had on the jury. The State has the burden to negate this effect or impact to the extent that it must establish beyond a reasonable doubt that the instruction *made no contribution* to the punishment that was assessed the defendant by the jury.

The lead opinion in this cause advises us that "the task of a reviewing court is to make 'an intelligent judgment' about whether the unconstitutional instruction 'might have affected [or influenced] deliberations of the jury on punishment.... (Page 299 of Maj. opinion). I must ask: How can a reviewing court make an intelligent decision or judgment call if it refuses to consider the best evidence or fails to use the best source available on the subject—the testimony of the jurors.

The original lead opinion in *Rose* on original submission ruled: "It is now the rule that jurors may not testify to any matter or statement occurring during the course of deliberations or to the effect of anything upon their minds or emotions influencing them or concerning their mental processes. Tex.R.Cr.Evid.Rule 606(b). To gain any insight into the basis and the rationale of a verdict *one must resort to evidence admitted, the charge on punishment, argument of the parties and other relevant indicia of record, if any.*" (536). However, the lead opinion recognized and acknowledged the following: "Whether jurors actually did discuss and consider parole law and good conduct time, and to what extent and effect, can never be properly discovered and adequately determined.... (537). I find that the only reason for this conclusion is because a majority of this Court refuses to permit those who can give us the answer to testify.

In the "Opinion on Court's Own Motion for Rehearing," in *Rose,* this Court did not deviate from its holding that the statute was unconstitutional. The lead opinion opted to hold that the harmless error test pursuant to Rule 81(b)(2), and not the "Almanza" test, would govern whether the error was harmless. Rule 81(b)(2) provides: "If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable

doubt that the error *made no contribution* to the conviction or to the punishment." (Emphasis supplied.) Except when the jury has assessed *no more than the minimum* punishment, other than through speculation or guess work, then how can it be said that the parole law instruction made no contribution to the punishment assessed?

In holding that the error was harmless, the lead opinion in *Rose* on rehearing concentrated on the following factors: (1) the maximum punishment that was assessed (life imprisonment); (2) the jury was given a "weasle worded" or "curative" instruction, or "ignore what I just told you" instruction, after it was given the erronous parole law instruction; (3) the facts of the primary offense were found to be heinous and aggravated; and (4) the jury was treated to the fact that the defendant had previously sustained five serious felony convictions. However, this list is not an all exclusive list, and actually bears little relationship to the issue that was before the Court at that time. The defendant's admissible prior criminal record, as far as assessing his punishment at life imprisonment, caused me to vote that the error was harmless. I now realize that I might have misjudged the issue in light of the wording of Rule 81(b)(2).

My criticism of the lead opinion on original submission in *Rose* rested on the fact that it refused to hold that it was impermissible for the members of the jury to be interviewed and asked whether the parole law instruction made any contribution to their verdict on punishment and, if so, what that contribution might have been. In this regard, I agree in part with what Presiding Judge McCormick stated: "In essence, the majority finds in the same opinion that the statute violates due course of law because the jury *considered* the parole laws yet such was harmless because the jury *did not consider the parole laws*." And Presiding Judge McCormick did not interview a single juror in this cause before he made this statement.

Thereafter, this Court remanded many, many cases to the courts of appeals to reconsider the issue of harmless error under Rule 81(b)(2) because the statute had been found to be unconstitutional by this Court. This, of course, did not set too well with most of the members of the courts of appeals, because all courts of appeals had upheld the constitutionality of the statute. Most justices, like Justice O'Connor of the Houston First Court of Appeals, exclaimed: "I do not understand how to apply the harm analysis the Court of Criminal Appeals tells us to use in *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1987) (op. on reh'gl). Nor do I, even after today.

The lead opinion in this cause informs us that "the State has the burden to show beyond a reasonable doubt that the error did not contribute to the verdict on punishment." (Page 298 of Maj. opinion.) To this extent, the lead opinion has made a valuable contribution to the jurisprudence of this State in that at least in one area there will be consistency among the 14 courts of appeals. Of course, because the State has the burden of proof, it can never conclusively establish beyond a reasonable doubt, without the assistance of the jurors, and except where only the minimum punishment was assessed, that the error was not harmful. Because of the way that Rule 81(b)(2) is worded, and the fact that the jurors cannot testify on the issue, there is actually an irrebutable presumption of harm against the State.

When the cases under consideration were tried, the statute had not been declared unconstitutional; it was thus permissible for the trial judge to so instruct the jury; it was permissible for the attorneys to argue the instruction; and it was permissible for the jurors to consider the instruction, although they could do so only in the abstract. Cf. page 300 of Maj. opinion. "In short, the jury can take the declarations into account in considering punishment, but without regard to what authorities may later do with the defendant." (Page 300 of slip opinion.) Except in a few rare instances, where the jury's notes are explicit, and the notes reflect that the jury in assessing punishment is actually using the mathematical formula set out in the charge, I am unaware whether the jury considered the

parole law instruction, either all or part, in assessing punishment, other than in the abstract. To say, as the lead opinion does, that the "best liklihood is that a jury will consider the 'existence,' [of the parole law instruction], and thereby assess a term of years it believes may ensure the defendant serves more than the minimum term prescribd regardless of what prison and parole authorities may later decide," is to merely guess, speculate, or act as a thirteenth juror might might have done. If the lead opinion's statement is correct, then *Rose* should have been reversed, and not affirmed.

The lead opinion in this cause informs us to look to the voir dire examination as one of the factors, without informing us how much time the attorneys had or should have had to complete their voir dire examination; look to the jury arguments, without informing us how much time the attorneys had or should have had to argue their respective cases; look to see whether the jury was given the "curative" instruction, or the "ignore what I just told you" instruction. "A verdict on punishment [however] alone is not a gauge for harm; rather, it serves somewhat as a barometric measure of other pressures we have found are likely to influence the jury in assessing punishment. There is no 'bright line' rule." (Page 307 of Maj. opinion.) So the majority opinion tells us.

In the opinion that I filed on rehearing in *Rose*, I pointed out that not all cases are going to nicely fit the facts of [*Rose v. State*]." *Rose*, at 557 (Teague, J., concurring opinion).

One factor omitted by the lead opinion in this cause is the fact that the place of trial may be an influencing factor on the punishment assessed, i.e., what might be denominated a "misdemeanor" murder in Houston might be characterized as a "felony" murder in Montague County. Why this is so, we just don't know. The lead opinion does consider as a factor multiple offenses on trial. Other factors that might be listed are whether the defendant had a prior criminal record, and how serious it might have been; the "good" reputation or char-

acter testimony about the defendant; whether the defendant was eligible for probation; the jury argument by the prosecution. Other factors could probably be created to exist.

The lead opinion finally concludes: "Admittedly, we cannot lay down a 'bright line rule' to measure the contribution a § 4 instruction will make to every result." (Page 313 of Maj. opinion.)

The lead opinion then analyzes several opinions by the courts of appeals, namely, *Arnold*, *Gaines*, *Hooper*, and *Payne*, which are from different courts of appeals.

In *Arnold*, on remand, the Dallas Court of Appeals, in a double murder case (jointly tried), without deciding whether the State or the defendant had the appellate burden to establish harmless error under Rule 81(b)(2), placed heavy emphasis upon the "curative" instruction found in the defective parole law instruction, and concluded that the error was harmless.

The lead opinion, which spends an inordinately amount of time on the jury arguments of the parties, holds that the court of appeals erred in relying upon the "curative" instruction to cure the defective parole law instruction. However, it concludes: "We have reviewed every germane revelation in this record and are satisfied that they did not influence the jury adversely to appellant in assessing punishment" at thirty years confinement' in the Department of Corrections.

In *Gaines*, the San Antonio Court of Appeals, only taking into consideration the facts of the case and the "curative" instruction, concluded that "the jury's assessment at less then one-third of the possible range of punishment with no fine assessed (punishment was assessed at 25 years' confinement in the Department of Corrections) does not reflect they were influenced by the parole law instruction. Consequently, we find beyond a reasonable doubt that the error of submission of the unconstitutional parole law provisions to the jury did not contribute to the punishment and was thus harmless error."

The lead opinion emphasizes once again the heinous facts of the case, the fact that

there was no "curative" instruction given, the jury arguments of the parties, the lack of mention of parole in the § 4(a) instruction, and the time of deliberations. It held that " 'no part of a § 4 instruction can be reasonbly characterized and fairly regarded as 'curative.' *Ibid.*" This Court assumes that "a jury may just as likely take into account the § 4 instruction and, therefore, examines the record 'for indicia of factors reasonably conducing to affect minds of average rational jurors in their determination of punishment.' *Ante*, at 300–301." As in *Arnold*, the lead opinion finds there was harmless error.

In *Hooper*, where the maximum penitentiary sentence and fine were assessed, the trial court gave the "curative" instruction, as occurred in *Rose*, although it also instructed the jury not to consider or discuss the effect of the parole law in the course of the jury's deliberations. Although the Houston First Court of Appeals discussed the facts of the case in *Hooper*, it did not find them to be as egregious as those found in *Rose*, and other cases. However, it did find that the prosecutor discussed the parole law (this is understandable, given the fact that such was in the jury charge). The court of appeals did not find harmless error, after considering the following factors: "(1) the maximum punishment was assessed; (2) no additional curative instruction was given; and (3) the argument by the prosecutor invited consideration of parole by the jury."

The lead opinion of *Hooper* in this cause affirmed the court of appeals' reversal of the trial court's judgment. In addition to setting out the facts of the case, the lead opinion also stressed the fact that the prosecutor "addressed the § 4 instruction" during his jury argument. But, given the fact that this was in the charge that was given, what was wrong with him so arguing the § 4 instruction at that time?

In *Payne*, the Dallas Court of Appeals affirmed, where the defendant received life imprisonment, enhanced, for murder. Other prior convictions, misdemeanors, were also admitted at the punishment stage of the trial. The court of appeals affirmed, holding that the facts were heinous, that there was a deadly weapon finding, that the defendant had several prior convictions, all of which caused the parole law instruction, though error, to be harmless to the defendant. The jury did send a question to the trial judge, "What is the earliest possible parole on a life sentence," with the trial judge instructing them to only consider the evidence they had heard and the law in the court's charge. Thus, they were not told to ignore the "weasle words."

The lead opinion in this cause holds: "That an appellate court believes facts of an offense are heinous and a prior criminal record shows propensity for violence can not rule out that a jury may have taken into account a § 4 instruction in assessing punishment. Indeed, a jury holding similar views is just as likely to assess maximum punishment in order to compensate for possibility for parole. Thus, such matters are of little consequence in a harmless error analysis." (Page 298 of Maj. opinion.) The lead opinion reversed the judgment of the court of appeals, holding that "the burden is on the State to demonstrate that such consideration [the jury charge] did NOT contribute to it, and we are unable to determine and to declare beyond a reasonable doubt that the error made no contribution to punishment assessed against appellant."

In *Barehill v. State*, 782 S.W.2d 506 (Tex.App.—1st [Houston]), Justice O'Connor, in the dissenting opinion that she filed, stated reasons why she was not impressed with the "weasle words" part of the parole law instruction, which were not put in that charge. She pointed out, however, that "[W]e cannot fault appellant for acting as if it [the charge] were constitutional. In discussing the parole law, appellant's defense cousel was acting according to the Legislature's expressd intent. The Legislature expected attorneys for the State and the defense to discuss parole in final arguments." I would put my amen to what Justice O'Connor has said when it comes to a jury question to the trial judge. Given the ambiguous, confusing, and misleading parole law instruction, what conscientous jury would not usually send out some note

or question requesting further information? It is truly amazing that more notes have not been sent by juries.

In sum, it is usually impossible to say, except where the facts of the case are bad and the defendant has a rather bad prior criminal conviction record, consisting of many violent crimes, that the statutory parole law instruction did not affect or impact the defendant's sentence that the jury assessed, unless he received the minimum sentence, which is a rare event in most criminal cases under those circumstances. In fact, in every single case I have had occasion to read from the courts of appeals, the punishment that was assessed most certainly fit the facts of the crime.

Therefore, if the standard to be used in reviewing a "Rose" error instruction is that the entire record is to be examined in a neutral and impartial manner, given the facts of the usual case, there will be no need for this Court to review those decisions by the court of appeals that affirmed the trial court's judgment, and should defer to those decisions that reverse. However, to do will nullify, rescind, and void Rule 81(b)(2), as far as this Court goes, which appears to be the way that this Court desires to treat that rule.

The "curative" or "weasle word" instruction that has often been invoked by some courts of appeals does not tell the jury not to consider parole and good time laws; only that they not talk about it aloud. If the "curative" or "weasel word" instruction is the "be all", this Court could have very easily, either in *Rose* or some other case, ruled that that although the parole law instruction is erroneous, it cleanses itself through the "curative" instruction. Unless this Court is willing to apply some sort of "totality of the circumstances" test to the parole law instruction error, and limits its remarks to the punishment assessed, I predict that reversible error will always be present unless the absolute minimum punishment is assessed by the jury. See *Rische v. State*, 755 S.W.2d 477, 478 (Tex. Cr.App.1988) (Teague, J., dissenting). In fact, the only way that the State can "win" a Rule 81(b)(2) issue is through some sort

of totality of the circumstances test, which the rule does not provide for. What the State and most members of this Court do not desire to accept is that they refuse to apply Rule 81(b)(2) in its literal language that was adopted by this Court. The error here does not concern any error that occurred at the guilt stage of the trial; the error lies in the court's charge to the jury. The issue in that instance is simply whether the minds of an average, rational juror would have reached the same result had the charge error not occurred. "The issue is really what effect or impact the error had or reasonably may have made upon the jury's decision in assessing the puniment it did [in light of the error in the charge]. The crucial thing is the impact of the thing done wrong on the minds of the other men and women, not on one's own in the total setting." *Diaz v. State*, 769 S.W.2d 307, 309 (Tex.App.—San Antonio 1989) (Carr, J., dissenting opinion).

I have concluded that in order to give our courts of appeals some much needed guidance, a bright line rule must exist. It must (1) permit the jurors to be interrogated on the issue; (2) hold that any assessment of punishment beyond the minimum is automatic reversible error; or (3) if the first two rules are inapplicable, and the court of appeals has correctly ruled, for example, that the State has the burden of proof to establish beyond a reasonable doubt that the error in the punishment charge is harmless beyond a reasonable doubt, then if the Court is not willing to apply the first two factors, this Court's policy will always be to defer to the decision of the court of appeals, which either reversed or affirmed the verdict of the jury on punishment.

Although in *Payne* the appellate court erred in its statement regarding the burden of proof, I find that it would be senseless to remand this cause to that court (note: the opinion remands the cause to the trial court, not the court of appeals), because if the court of appeals should hold that the error was not harmless beyond a reasonable doubt, the State, through its local district attorney, if no one else, will surely petition this Court for review and it will

then be necessary for this Court to affirm the judgment of the court of appeals.

In Texas, in assessing punishment, the jury is free to take into consideration the facts of the case. Furthermore, the jury is free to assess punishment anywhere within the range of punishment provided for that offense. Thus, based solely on the facts of the case, and the State did not present any evidence at the punishment stage of the trial, the jury is free to assess a 17 year old's first degree conviction, who had no prior convictions, and the State did not present any evidence at the punishment stage of the trial, at life imprisonment, just as the jury could assess the minimum punishment for some old "con" who had spent most of his lifetime committing criminal wrongs, who committed the same offense as the 17 year old did.

In *Gabriel v. State*, 756 S.W.2d 68 (Tex. App.—Houston [1st Dist.] 1988), Justice Cohen perhaps hit the nail on the head when he made the following observations:

> Determining whether the parole charge is harmless is one of the most difficult and least objective decisions we are called upon to make. Different courts (and different panels of the same court) are unlikely to achieve consistent results under this highly subjective standard. Moreover, current law makes it impossible for the parties to prove harm or lack of harm. Tex.R.Crim.Evid. 606(b) prohibits a juror from testifying about any statement occurring during deliberation or its effect on his vote or mental processes. The sole source of objective guidance on the harm issue is thus unavailable. We are left with two unpleasant choices: we must either reverse every case where punishment exceeded the minimum or make poorly educated guesses about whether the defendant was harmed.... (at 69–70).

Justice Cohen argued that the escape route from this dilemma was to apply the contemporaneous objection rule to the issue. However, this Court in *Rose* held that it was unnecessary to object to the parole law charge.

Much like a jury deciding the answers to the special issues in a death penalty case, oftentimes the punishment assessed in a non-capital case depends upon the "luck of the draw" as to what jury hears the case. One jury may be, for whatever reason, sympathetic towards the defendant, and assess a punishment that no rational jury would even think about assessing, whereas another jury may assess a punishment that "shocks the conscience" of any rational individual.

Because of the error in the charge, there is an appellate presumption that the error was harmful. The State has the burden to rebut this presumption of error by establishing beyond a reasonable doubt that the error made *no contribution* to the punishment verdict. Justice Carr pointed out in *Diaz v. State*, supra, "it is not an appellate court's function to determine punishment. Nor is it permissible to speculate upon probable reassessment of punishment ... The question is not was the jury right in their assessment of punishment, regardless of the error or its effect upon the jury. It is rather what effect the error had or reasonably may be taken to have had upon jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men and women, not on one's own, in the total setting ... The question is whether or not we can say that the error made no contribution beyond a reasonable doubt given the number of years assessed by the jury...."

What causes the problem to become difficult to resolve is two fold: (1) the wording of Rule 81(b)(2), i.e., the case will be reversed "unless the appellate court determines beyond a reasonable doubt that the error made *no contribution* to the conviction or to the punishment" (emphasis added), and (2) the fact that the jurors are not permitted to inform us of what effect, if any, the parole law instruction might have had on the punishment they assessed. Compare Rule 52(a) and (b) of the Federal Rules of Criminal Procedure. As previously pointed out, it is the State in this instance which has the burden of proof to establish beyond a reasonable doubt that the charge error was harmless beyond a reasonable doubt.

The problem with the "Rose" error charge rests in the fact that to resolve the issue, an appellate court must engage in either speculation or guess work as to what contribution, if any, the error had on the jury that assessed the punishment. Without being able to communicate with the jury, it appears that the error as to punishment is reversible per se. Therefore, given the wording of Rule 81(b)(2) and the fact that the parties may not have the jurors testify as to whether the "Rose" charge contributed to the punishment they assessed, the error is reversible per se.

In conclusion, although this Court did not draft Rule 81(b)(2), it adopted same. Thus, until the rule is changed, this Court must bite the bullet on all of the "Rose" charge cases, and reverse and remand those cases to the trial court.

It is therefore necessary to reverse all of the above cases listed in this consolidated cause and remand them to the trial court.